ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 06 2017

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA   DIVISION

|  |  |
|---|---|
| **BURDETTE LOWE,** | : |
| **Plaintiff** *pro se* | : |
|  | : |
|  | : |
| **v.** | : **CIVIL ACTION NO.** |
|  | : **1:16-CV-3717-TWT-JSA** |
| **DELTA AIRLINES, INC** | : |
| **Defendant** | : **DEMAND FOR JURY TRIAL** |

### PLAINTIFF'S SECOND AMENDED COMPLAINT

Per the Judge's Order Dkt 20, Plaintiff, *pro se* Burdette Lowe respectfully submits this Second Amended complaint which combines Civil actions 1:16-cv-TWT-JSA and 1:16-cv-RWS-JSA. Those two complaints were initially filed separately by the Plaintiff because the EEOC sent two separate Notice-to-Sue Notices to the Plaintiff at different time periods.

### Claims and Jurisdiction

1. This employment discrimination lawsuit is bought under:
    a. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§§ 2000e et seq., for employment discrimination on the basis of retaliation,

harassment, interference, disability for exercising rights under this statue.

Plaintiff has received a notice of right-to-sue letter from the Equal Employment Opportunity Commission (EEOC).

     b. American with Disabilities Act of 1990 as amended, 42 U.S.C. §§12101 et seq., and Title V of ADA for employment discrimination on the basis of disability, retaliation, harassment, interference for exercising rights under this statue. Plaintiff has received a notice of right-to-sue- letter from the Equal Employment Opportunity Commission (EEOC).

     c. Restatement (Second) Tort § 46

     d. Rehabilitation Act, 29 U.S.C. §503, §504, and §701

     e. Article IV of the U.S. Constitution

     f. MN Human Rights Act, Minn. Stat. Ch. 343A

**2.** This Court has subject matter jurisdiction over this case under the above-listed statues and under 28 U.S.C. §§ 1331, 1332, and 1343. The basis for the jurisdiction is Federal question and that of Diversity of Citizenship. Plaintiff was employed by Northwest Airlines (NWA) until their 2008 merger with Delta Airlines, Inc., at which time she became a Delta employee and along with all other NWA employees was classified as PMNW. Plaintiff had been in continuous employment with Northwest/Delta from November 1987 until her forced retirement on July

30, 2013.  Plaintiff is both, a MN employee per a NWA Conditions of Employment Agreement and a GA resident since 1993.

3. The Defendant is a corporation headquartered in GA, and has operations in MI, MN, and GA.

## Parties

4. **Plaintiff:**  Burdette Lowe, P.O. Box 92421, Atlanta, GA 30314

5. **Defendant:**  Delta Airlines, Inc., 1030 Delta Boulevard, Atlanta, GA 30354-1989

## Location and Time

6. The Defendant is a national and international corporation, with numerous points of operation including MN, MI, and GA.  Plaintiff is unsure of the exact location of the Defendant or its outside agents when each acts occurred:  some actions occurred in person, emails, telephone, and others by written correspondence. Plaintiff's employment records are electronically maintained as well as hard copies may be in MI, MN, as well as in GA.  Therefore, Defendant's adverse actions and decisions toward the Plaintiff that are the subject of this civil action could have been made from MN – Defendant's former headquarters under NWA and Conditions of Employment Agreement, MI-Plaintiff's former base, and GA-Defendant's present headquarters' all causes of actions are under Federal law and therefore Federal jurisdiction.

**7.** Plaintiff alleges the discriminatory actions that are the basis for filing this action occurred at various times between 2005 and October 18, 2013. She learned of the retaliatory discharge action in January 2014.

### Administrative Procedures

**8.** Plaintiff filed her initial discrimination charges with EEOC, against the defendant, on August 20, 2013 Dkt #11-1 and an additional Charge complaint on February 4, 2014 Dkt #11-2.

**9.** Plaintiff received her first Notice of Right-To-Sue letter from the EEOC on or about July 6, 2016  and the second notice-of-right to sue on August 10, 2016.

**10.** Plaintiff is not suing for age discrimination

**11.** Plaintiff is not employed by an agency of the State of Georgia or unsuccessfully sought employment with a State agency.  Plaintiff did not file a complaint against the defendant with the Georgia Commission on Equal Opportunity.

**12.** Plaintiff is not employed by a Federal agency or unsuccessfully sought employment with a Federal agency.  Plaintiff did not complete the administrative process established by that agency for persons alleging denial of equal employment opportunity.

## Nature of the Case

**13.**    Retaliatory Discharge, Intentional Infliction of Distress, Retaliatory Hostile/Abusive Work environment, Constructive Discharge, Retaliatory Harassment    Discrimination,    Disability    Harassment,    Retaliatory Discrimination, Failure to Accommodate, Interference, Failure to Engage in Good Faith Interactive Process,  Violation of ERISA and Terms and Conditions and Privileges of employment differ from those of similarly situated employees. Disability Discrimination, Retaliation, Discrimination for engaging in/opposition to participation in unlawful protected activity, interference, harassment, and Disparate Treatment.

**14.**    Plaintiff did complain about the conduct in her charge of discrimination, under the category of discrimination retaliation, including disability discrimination retaliation and harassment via ADA, and reasonable accommodation.

## Claims

**15.**  Plaintiff believes she was harassed, discriminated, and retaliated against because of her 1) psychological disability-PTSD, Depression, and Anxiety, her protected activities of participation in EEOC process 2) filing

an EEOC complaint and 3) her good faith opposition to a practice of her employer that she believes violated federal anti-discrimination laws.

16. Because of her participation in ADA protected activity

   a. Filing EEOC ADA charges,

   b. Requesting reasonable accommodation, and

   c. Participation in the accommodation process

17. Because Plaintiff and her advocate complained to Defendant's former CEO Richard Anderson

18. Because Plaintiff pursued Workers Compensation claims - Plaintiff under the Defendant's agreement is a MN employee.

19. At all times relevant to this suit Plaintiff was employed with NWA/Delta Airlines, Inc., first in November 1987 in Management as a Customer Service Assistant (CSA)/Meet and Greet and then when she transferred in February 1989 to In-Flight Services as a Flight Attendant. Plaintiff's employment ended July 30, 2013 when Defendant's behavior led Plaintiff to a forced retirement - which was later converted to a retaliatory discharge between July 30, 2013 and October 18, 2013 after Defendant, changed her retirement to termination via a coding error unrequested resignation.

20.     **INTRODUCTION STATEMENT**

How can a person retire and then have their retirement changed to "resignation" after the fact? Resignations are separations from an employer initiated by an employee, usually for a specified reason. Termination/fired occurs when an employer initiates the separation. Plaintiff alleges she was first constructively discharged—involuntary retire on July 30, 2013 because of Defendant's continuous bullying--psychological abuse that was at its height in 2012-2013, when Plaintiff was most vulnerable and at her an extreme weaken mental and emotional state.

The heart of the causes of actions against the Defendant are predicated on retaliation, harassment, intentional infliction of distress, psychological violence that traumatized Plaintiff enough to seek a Constructive Discharge retirement.

The Plaintiff alleges the Defendant invoked repeated psychological trauma on her, while knowing her fragile condition. Defendant not only continuously lied to Plaintiff about things relevant to her recovery and return-to-work efforts, and mental health status, the Defendant through their agents and management employees did subject the Plaintiff to psychological bullying and violence that hinder Plaintiff's back to work

efforts. Defendant's repeated actions of providing Plaintiff with letters and emails that contained threats, discrepancies, inaccurate information, and omission of facts, and distortion of facts/outright lies created unnecessary additional stress and distress for Plaintiff.

Plaintiff has experienced numerous incidences of bullying, misrepresentation of facts, deceptions, unlawful inference with Plaintiff exercising legal protections and rights including ADA and EEOC, and denial of access to Defendant's written policies.

## FACTS COMMON TO ALL CAUSES OF ACTIONS

1.     How does a person retire and is terminated after they retire? Plaintiff pro se Burdette Lowe is such a person. Plaintiff *pro se*, Burdette Lowe, is a 53 year old African American disabled female. Plaintiff was hired by Northwest Airlines in November 1987 in a newly created management position as a Customer Service Assistant/Meet and Greet.

2. February 1989 Plaintiff transferred to Inflight Department to be a Flight Attendant.

3. Plaintiff was an excellent employee with outstanding employee evaluations, numerous letters of commendations from fellow employees, passenger, and staff personal and treated fairly by the Defendant.

4. Plaintiff had also earned a perfect attendance award as well as a Certificate of Excellence award.

5. Plaintiff received recognitions for going above and beyond the call of duty and helping the Defendant (NWA) promote good customer service and save the company money by working two separate flights out of Atlanta on her time off to prevent the flights cancelling.

6. She also received an award from her Base for being an excellent employee.

7. Plaintiff was an International/Domestic and NBA Sports Team Charter Qualified Flight Attendant who loved her career.

8. Plaintiff had over twenty-five years of continuous service with the Defendant and no Breaks-in-Service with NWA/Delta Airlines, Inc. prior to her separation from the Defendant.

9. Shortly after returning to work from her ankle injury, in March 2006, Plaintiff inhaled toxic chemicals from a faulty fire extinguisher that was discharging on its own while working a flight from Detroit to Amsterdam on April 22, 2006.

10. Inhaling toxic chemical from Halon Fire Extinguisher (red bottle) during the April 22, 2006 incident left Plaintiff with a permanent

condition known as Occupational Induced Asthma--Reactive Airways Dysfunction Syndrome (RADS).

11.    Plaintiff was left with an inability to breathe freely without fear and resulted in her compromised psychological condition/disability PTSD, Depression, and Anxiety.

12.    Plaintiff's is disabled as defined under EEOC Enforcement Guidelines Workers' Compensation and ADA. Dkt #16-2

13.    Defendant knew of Plaintiff's medical condition/disability from the medical notes she provided from 2006 to 2010, from the workers' compensation litigation, from Dr. Orme's letter, and the monthly progress reports from Fran Williams, MN QRC (Qualified Rehabilitation Consultant).

14.    As a result of her work related injury Plaintiff was on an approved NWA Flight Attendant contractual Disability Medical Leave of Absence that began in 2007 and ended in 2012.

15.    NWA merged with Delta, Airlines, Inc., in 2008, under the merger all NWA employees including those on inactive status like Plaintiff were classified as Pre-Merger Northwest (PMNW).

16.    In accordance with Defendant's own workers' compensation policies, Plaintiff should have been placed on an Unpaid Approved Disability leave.   Dkt 19-4

17.    Since 2005 to October 31, 2013, with emphasis on 2012/2013 the Defendant established an unlawful pattern of interference with Plaintiff exercising EEOC and ADA rights and protections.

18.    Defendant continuously required Plaintiff to resign and waive all legal rights including those protected under Federal law and statues; including Civil Rights and ADA via various settlement agreements, in order to settle her workers' compensation claims.

19.    Plaintiff alleges Defendant also established a pattern of psychological abuse and did continuously and recklessly ignored Plaintiff's psychological condition and pursued her relentlessly with distortion of facts/outright lies, incorrect, incomplete information, and discrepancies that caused the Plaintiff to suffer additional mental, emotional, physical, and financial trauma, anguish and distress.

20.    Plaintiff was in opposition to participating in actions that she in good faith believed were wrong in nature, thus she was in opposition to signing the agreements.

## FACTS FROM 2011 TO 2014 INCIDENTS

21.     Plaintiff reached her 25th anniversary with the Defendant in November 21, 2011.

22.     Defendant was informed in a letter dated November 22, 2011 by Plaintiff's mental health provider Dr. Terry Orme that she was not able to return to flying status.

23.     The NWA Flight Attendant Agreement expires, December 2011. Plaintiff contacted Mary Byrnes (former NWA) by email on December 29, 2011 to determine her employment status and what will happen to her.

24.     Plaintiff emailed Mary Byrnes again on December 30, 2011 about the Defendant's comedy of errors, requesting all correspondence occur via email, Defendant's confusing actions, Defendant's lack of proper procedures, Defendant's blatant lie about Plaintiff's 120 day expiration of her leave and return to work notification.

25.     Comedy of errors comment was said to Plaintiff after her November 2005 ankle injury.  Plaintiff was wrongly informed by Whitehead to handwrite her Light Duty time-sheets Light Duty.  Although Plaintiff complied, Defendant's insurer Liberty Mutual refused to pay Plaintiff and instead informed her she had submitted improper pay sheets.

26. Knowing Plaintiff was unable to return to full duty, Sue McGlone, Base Director-DTW advised Plaintiff in a letter dated January 9, 2012 (ten days prior to the scheduled January 19, 2012 workers' compensation mediation conference held in Minnesota) that she must return to full flight attendant status or face termination.

27. Included in the letter is a statement the first letter had been Fed Ex to Plaintiff's P.O. Box --- this is not true because Fed Ex as a business practice does not and has never delivered to P.O. Boxes.

28. Ms. McGlone's letter was issued ten days prior to a January 19, 2012 – Mediation hearing in MN between the Plaintiff and the Defendant - to resolve Plaintiff's workers' compensation case.

29. During the mediation conference Plaintiff was again offered settlement requiring resignation and waiving legal claims including Federal and ADA protections and rights. She refused.

30. Defendant did not offer Plaintiff an option of beginning the initial reasonable accommodation interactive dialogue.

31. Plaintiff requested Defendant to consider her for reasonable accommodation consideration. Her request was denied.

32.     Plaintiff asked if they would allow her to retire.  The answer was no.

33.     February 6, 2012 Plaintiff wrote a letter to Defendant's then CEO Richard Anderson, detailing her situation, and asking for intervention to make the harmful behavior stop.  **EXHIBIT A**

34.     When asked Plaintiff inform Defendant's denial of accommodation consideration to Fran Williams who included the email in her monthly Progress Reports to the MN Department of Labor.

35.     Defendant's MN Workers' Compensation lawyer, Robin Simpson sent Plaintiff an email and letter dated Feb 10, 2012 stating Delta was now considering Reasonable Accommodations.

36.     Dr. Orme wrote a letter dated February 20, 2012 regarding Plaintiff's restrictions, reasonable accommodations, and his inclusion in the process including a case conference.

37.     His request for a conference with all involved parties in attendance was denied.

38.     In a letter dated March 1, 2012 from Michele Parker, Managing Director Human Resources, to the Plaintiff, referencing Plaintiff's February 2012 letters to Mr. Anderson,  Parker promised to get back with Plaintiff

once her review was complete; Ms. Parker never followed-up with Plaintiff.

39.     Plaintiff's concerns and cries for help via to remedy deceptive atmosphere and situation and mental harassment were ignore.

40.     Plaintiff's request for an advocate or Dr. Orme to participate with her in the Defendant's reasonable accommodation interactive process was denied by Janice Lawrence, Return-to-Work Specialist Sedgwick Claims Management Services, Inc. —Defendant's company for disability certification.

41.     On April 20, 2012 Defendant's agent Janice Lawrence was advised via fax the Plaintiff was in fragile condition and advised that all parties sign off on any work related changes.  He again asked for a teleconference with all interested parties. His request was denied.

42.     Plaintiff was informed by an April 30, 2012 email from Janice Lawrence that the Defendant's policy is that no third party participants are allowed during the interactive dialogue meeting.

43.     When Plaintiff requested a written copy of the policy from Ms. Lawrence and was informed on May 3, 2012 there wasn't a written policy, it is one of the Defendant's unwritten practices, "It is a long standing

operational policy that is consistently applied to all employee and employer matters."

44.     Although Defendant did allow Ms. Williams, a neutral party whose services were paid for by Liberty Mutual, Workers Compensation Insurer and NWA/Delta into the meeting, Plaintiff still was not allowed someone on her behalf.

45.     On May 18, 2012, Plaintiff agreed under duress and distress to participate alone in an interactive conference.  Plaintiff was then subjected participating alone without anyone representing her interest with five individuals representing the Defendant's interest.

46.     The individuals representing the Defendant were Janice Lawrence, Sedgwick; Mindette Fredrikson EQ Manager; Kevin Scott, Manager, Inflight Services Admin; Barbara Stanisz, Filed Service Manager; and Linda Nimpson, HR Generalist.

47.     Although Plaintiff had advised Ms. Lawrence on May 1, 2012 the because of the nature of her medical situation, Defendant would need to contact Dr. Orme regarding any questions of her medical condition and work accommodation.

48.     Defendant proceeded to ask Plaintiff about her mental health status during the interactive telephone conference meeting that Dr. Orme had been denied access.

49.     Plaintiff was subjected to a second telephone conference meeting on June 18, 2012 with five individuals representing Delta within days of learning of Dr. Orme's unexpectantly dying; Ms. Williams was allowed to participate in this meeting.

50.     The six people representing Delta's interest included Janice Lawrence, Mindette Fredrikson, Kevin Scott, Barbara Stanisz, Linda Nimpson, and Annelyse Greene.

51.      Although Plaintiff suffers from psychological conditions and unable to handle stress and Defendant was aware of her fragile state, she was required to participate alone in an "interactive process" with six Delta individual representing the Defendant's interests.

52.     Plaintiff was asked to go against Dr. Orme's medical orders that he be included in any consideration and decisions about new job placement.

53.     During the conversation Plaintiff becomes overwhelmed and distraught during the call and has an emotional breakdown, crying. Delta

wants to move forward in violation of Plaintiff's mental health provider's medical opinion.

54.    Plaintiff asks about access to non-flying Flight Attendant Special Assignment positions and is denied.

55.    Defendant denied her access to biddable positions within her department.

56.    Defendant did not offer Plaintiff a reassignment position.  She was instructed view positions online and compete for a position.

57.    Defendant did not indicate that allowing Plaintiff to be considered for non-flying Special Assignment positions would cause them undue hardship.

58.    On the June 19, 2012 the day after her interactive process – Ms. Greene, Defendant's EEOC Specialist contacts Plaintiff she is still too distraught and cannot handle talking.

59.    On June 20, 2012 Ms. Greens email's Plaintiff about finding another job, conducting a job search and she will contact Plaintiff in two weeks regarding her progress.   Ms. Greene did not follow-up with Plaintiff.

60.     Plaintiff is not psychologically equipped to handle the situation.  Plaintiff responded to Ms. Greene' with an email dated June 20, 2012 detailing her experience, fears, hostile, and intimidating experience at the hands of the defendant.  **EXHIBIT B**

61.     Plaintiff did eventually check open positions, however, without her medical provider's input she could not say if she could perform any of the listings.

62.     Defendant and Plaintiff agree Plaintiff would be allowed time to find a new doctor, and Ms. Williams would keep Defendant apprised f Plaintiff's progress.

63.     Defendant was aware that Dr. Orme's death facilitated a change in Plaintiff's psychologist and resulted in a delay in Plaintiff's medical management and return-to-work service.

64.     July-August 2012 – Plaintiff continues to works with Ms. Williams to find a new mental health provider.  Plaintiff selects Dr. Edith Fresh, as her new provider.

65.     Plaintiff informed Ms. Williams by email on August 24, 2012 of Dr. Edith Fresh to assume Dr. Orme's position as her mental health physician.

66.     Plaintiff contacted Ms. Greene and Ms. Williams via email on September 17, 2012 to inform them Liberty Mutual is again denying her treatment with Dr. Fresh.

67.     Liberty Mutual will not pay Dr. Fresh's bill unless she submits her medical notes with each bill.  Plaintiff does not know Liberty Mutual to require this practice with her other providers.

68.     Plaintiff has to cancel her November 1, 2012 appointment because insurer still has not issued Dr. Fresh her payments and the bill is over $700.  **EXHIBIT C**

69.     Plaintiff's treatment is interrupted again.  .

70.     Liberty Mutual does not issue a payment until the end of October.  It takes a while to work Plaintiff back into the schedule.

71.     Plaintiff receives a letter dated October 3, 2012 from Annelyse Greene, Delta EO Accommodations Specialist.   The letter contains numerous incorrect information and distortion of facts.

72.     The letter states erroneously states Plaintiff had not informed Defendant of her new mental health provider—Ms. Greene knew on September 18, 2012 that Plaintiff had a new mental health provider.

73.     Defendant did not provide Dr. Fresh an opportunity to adequately access Plaintiff as agreed.

74.     Defendant agreed to Plaintiff's need for additional time for Plaintiff to find a new doctor, and was aware that Plaintiff treatment had ceased because of lack of payment.

75.     Defendant did untimely stop the interactive reasonable accommodation process for meritless reasons and did not indicate to Plaintiff that the accommodation was causing them undue hardship.

76.     Defendant contends Plaintiff did not bid on a position:

   a. Plaintiff required her mental health provider's input;

   b. Defendant did not conduct its two-week follow-up to Plaintiff's they specified;

   c. Defendant did not offer reassignment,

   d. Plaintiff lacked the knowledge and expertise needed to access if she was equipped within her condition for any job posted;

   e. Defendant did not provide the essential functions of jobs posted;

   f. Plaintiff had just resumed treatment, and

Page **21** of **76**

g.  Defendant had not requested another interactive dialogue with her and or with her new treating physician.

77.  Plaintiff never received an email that Ms. Greene alleges she sent on August 28, 2012.

78.  Defendant did cease the Reasonable Accommodation process without merit, and again, threaten to terminate Plaintiff, "If we do not hear from you by October 12, 2012 you will no longer be on an approved leave of absence and your employment may be ended."

79.  After receiving payment Dr. Fresh wrote a letter dated November 7, 2012 explaining the delay in completing the paperwork, inadequate time to address Plaintiff's conditions and develop and effective treatment plan.   Her letter indicates Plaintiff's compromised emotional state.

80.  Plaintiff was already in a deteriorating and vulnerable condition; Liberty Mutual's denial of caused Plaintiff's treatment to cease again caused the Plaintiff unnecessary additional stress and emotional harm.

81.     She began to sleep even less, almost to the point of not sleeping at all.  Her appetite decreased even more.    Plaintiff felt like she was drowning and one knew.

82.     Plaintiff had done as required and it was not enough. The interruption of treatment and psychological bullying into participating alone under duress with up to six individuals representing Delta's interest and no one representing the Plaintiff's sole interest.  The constant bullying via psychological attacks were causing her additional stress; she was having a difficult time coping.

83.     Eventually Plaintiff again contacted Mr. Anderson, CEO and again asks for intervention.  No one at Delta appeared to be helping to better the situation; the distortions continued eventually causing Plaintiff to seek a retirement to end her psychological abuse.

84.     Plaintiff requested and Defendant agrees to her July 30, 2013 retirement. Defendant agrees orally, in writing, and through the employee website that Plaintiff is eligible to retire.

85.     Plaintiff questions Defendant's Continuous Service and Break-in-service as justification to deny her, her earned pass travel benefits. Defendant refuses to properly address Plaintiff's concerns and instead

provides her with vacation information and pass travel policy. Not retirement policy.

86.     Defendant ignores Helen Huyler's requests dated May 27, 2013 Dkt # 19-17 for intervention so Plaintiff could participate in the retirement process as any other employee with over 25 years of continuous service. The requests were ignored.

87.     Helene Huyler letter dated July 15, 2013, Dkt # 19-8 was just 15 days prior to Plaintiff's scheduled retirement to Defendant's legal counsel Sheandra Clark regarding the confusion and Plaintiff's concerns and Defendant's refusal to properly address the calculation of time and provide Plaintiff with written polices; all attempts to remedy the situation were ignored or not adequately address.

**88.**     Defendant informed Plaintiff orally, in writing, and their electronic employee portal that Plaintiff had reached twenty-five years of service and was eligible for retirement.

**89.**     Defendant agreed in writing that Plaintiff would retire on July 30, 2013.

90.     Sometime between July 30, 2013 (according to a letter dated October 18, 2013) and October 18, 2013 Defendant changed Plaintiff's retirement to termination under the auspices of a resignation.

91.     Defendant informed Plaintiff she was eligible for benefits then said she was not eligible for benefits.

92.     Defendant would not provide Plaintiff with her numerous requests for NWA and Delta Airlines written policies that her inactive status affected her years of years of service, that were used to justify denial of retirement benefits including retiree pass travel.

93.     Defendant has not provided Plaintiff with a written retirement policy that Plaintiff was not eligible to retire because of her interactive status.

94.     Defendant ignored Plaintiff's requests to Delta's CEO and her advocate's requests to Delta's CEO and other managers for intervention to remedy the stressful situation.  Defendant silence allowed the bullying and intimidating actions to continue.  Defendant failed to reasonable protects Plaintiff from psychological assaults.

95.      Defendant did not inform Plaintiff of their policy that workers injured on the job who sustained a disability verified by Liberty Mutual and

or Sedgwick are placed under Disability Leave of Absence, from which an individual may retire, receive health benefits, travel benefits, and other benefits.

96.     At the time of her injury Plaintiff was under a NWA Flight Attendant contract that contained Medical Disability Leave of Absence. Plaintiff was on a Disability Leave of absence until May 2012.     Plaintiff should have continued her NWA disability leave under Delta's Disability Leave.

97.     Defendant knowing Plaintiff had just reestablished treatment, after Dr. Orme's death and the problems with their insurer did reneged on allowing the new provider sufficient time to evaluate Plaintiff, records, devise a plan, and participate in an interactive process with the Defendant.

98. Defendant did not indicate to Plaintiff that allowing additional time because of the extenuating circumstances 1) death, 2) submitting numerous reports, 3) need to cancel Plaintiff's appointments because of Defendant's insurer or allowing Plaintiff access to non-flying Special Assignment positions would cause them undue hardship.

99.     On October 31, 2013 Plaintiff was again presented settlement agreement to resign, waive all legal rights, and inadequate consideration. She again questions the document and refuses to sign.

100.     Her lawyer informs Plaintiff if she does not sign, she will lose her as her lawyer.  Plaintiff lost representation, and within ten to fourteen days of Plaintiff refusal, Defendant's insurer, with the Defendant's knowledge again immediately ceases her mental health treatment without due notice or process.

101.   Plaintiff's mental health provider was not consulted or informed about the denial of service.  Plaintiff was notified by mail without warning.  Plaintiff attempted to continue treatment; however, it was too expensive.

102.     Plaintiff retired July 30, 2013 and filed a complaint with EEOC in August 2013.  She was again offered an unlawful settlement requiring her to waive federal rights on October 31, 2013.

103.     January 28, 2014 – Plaintiff receives her workers compensation file and learns via a letter not addressed to her that Defendant after informing Plaintiff she was eligible to retire and agreed to July 30, 2013 retirement date, did change Plaintiff's retirement to a resignation after the

fact, thereby, wrongfully terminate the Plaintiff sometime between July 30, 2013 as the letter alleges and October 18, 2013 the date of the letter.

104.   The file contained a letter from the Defendant's Workers' Compensation lawyer to Plaintiff's lawyer stating a "coding error" and Plaintiff was not retired, it was a resignation.  Defendant has yet to contact Plaintiff directly on Delta letterhead about "coding error" or "resignation" or advise her of evidence of any discrepancies to justify the adverse coding.

105.   Plaintiff filed EEOC complaint on February 4, 2014.

106.   Since 2011/2012 Defendant has a documented pattern of making up and distorting facts into outright lies.

## CAUSES OF ACTIONS

From herein to all causes of actions Plaintiff is:

**107. Disabled** - disabled as defined under the ADA and Workers Compensation Guidelines Dkt#.  Plaintiff has a record of her disability — PTSD, depression, and anxiety that dates back to her 2006 work injury, Defendant has known about Plaintiff's psychological impairments since 2006.

108. Plaintiff provided with monthly was provided monthly doctor excuses from 2006-2010, Defendant had access to her medical condition

because of the workers' compensation litigation, and regular updates from Fran Williams, a MN Qualified Rehabilitation Consultant.

**109. Protected Activities:**

(a) Plaintiff alleges the Defendant retaliated against her participation in EEOC process, by filing a claim against them.

(b) For her opposition to participating in what she in good faith believes was an unlawful practice of interfering with Plaintiff's ability to exercise rights and protections under EEOC and ADA.

(1) Plaintiff was against signing settlement agreements that were unlawfully interfering with her exercising Federal rights and protections, including EEOC and ADA.

(2) Requiring her to resign without the benefit of participating in reasonable accommodation interactive process.

(c) Requesting reasonable accommodations

(d) Participating in the accommodation process

(e) Complaining to Defendant's former CEO

(f) Because she continues to pursue a workers' compensation claim against the Defendant.

Defendant's actions constitute retaliation, harassment, interference, bullying/intimidation, coercion, and discrimination.

109.    Starting in November 2005 to November 2013 the Defendant has established a pattern of continuous actions of intimidation, deception, coercion, and interfering with Plaintiff's medical treatment and her exercising rights and protection established by the Federal government as well as MN State law.

110.    Defendant refused to allow the Plaintiff to settle her Worker Compensation claim nightmare unless she resigned, forgo appropriate consideration, and waived all legal protections and rights including those protected under Federal law and statues; including EEOC and ADA via various settlement agreements.

111.    Plaintiff asked to retire.  Plaintiff could not and did orally agree or sign any agreement waiving legal rights and protections and or to resign.    Plaintiff did not initiate or agree to a resignation, therefore, Plaintiff contends she was fired.

## I.    COUNT ONE

**(Retaliatory Discharge/Termination: 42 U.S.C. 12203 --- ADA)**

112. Plaintiff re-alleges and incorporates all the above paragraphs as if fully set herein.

113. Plaintiff was fired. Plaintiff's retirement was changed to a termination under the guise of a coding error resignation by the Defendant after she retired.

114. Defendant's egregious, malice, and retaliatory action denied and interfered with the Plaintiff's earned employment privilege of retiring with joy, dignity and honor that twenty-five plus years of continuous service should garner and Plaintiff receiving earned retirement benefits.

115. As a direct proximate result of the Defendant's violation, Plaintiff has been deprived of her ADA rights by denying her the terms and conditions and privileges of employment as others who have retired.

116. Plaintiff requested and Defendant agreed in writing Plaintiff was eligible to retire and approved July 30, 2013 as her retirement date.

117. Defendant has not provided Plaintiff with written policy from NWA and Delta that her inactive status does not count toward continuous years of service and constitute a break in service.

118.  Plaintiff made several request to Linda Nimpson to provide the written policy her request were ignored.

119.  Fifteen days prior to Plaintiff's retirement advocate Helen Huyler did also request the Defendant to address the confusing situation. Defendant's legal counsel and Linda Nimpson of Human Resources ignored the request.

120.  Instead, Defendant continued their pathological atmosphere and pattern of deception psychological bullying was to inflict Plaintiff with additional stress and distress to force her to resign with Plaintiff receiving another request to resign via settlement on July 16, 2013.

121.  Defendant's silence and inactions created and condones deceptive and hostile employment atmosphere in total disregard and in violation of Federal rules and statues and Plaintiff's psychological impairment.

122.  There is close proximity of events and incidents or coincident that connects Plaintiff's refusal to resign and Defendant's discovery of a coding error resignation after she retired and Defendant's inability to directly achieve Plaintiff voluntarily resigning.

123.  There a causal connection between the July 15, 2013 letter written to defendant to address the retirement confusion, and July 16, 2013 Plaintiff is again presented with Defendant's settlement agreement to resign, and July 30, 2013 Plaintiff, believes she has retired.   And Plaintiff files EEOC complaint August 20, 2013.  Then October 31, 2013 Plaintiff is again asked to sign Defendant's settlement that she resigned on the date she signed.  When Plaintiff could not sign, her lawyer withdraws legal service and in less than two weeks Defendant's insurer with Defendant's knowledge closes Plaintiff mental health services without consulting Dr. Fresh her doctor. January 2014, Plaintiff, receives her file, and finds letter from Defendant's lawyer to her former lawyer, about a coding error resignation.

124.  Defendant's coding error resignation is a pretext and attempt to cover-up their unlawful retaliatory actions and employment practices.

125. Defendant would not have fired Plaintiff but for the fact she continually stood in opposition to signing a settlement agreement requiring her to resign even after she had retired, and waive Federal protections and rights.

127. If she had accepted Defendant's settlement and resignation that was offered after her July 30th retirement she would have been required to drop her EEOC complaint.

128. Plaintiff was denied the enjoyment of the experience of employment benefit of retiring, and receiving retirement benefits.

129. As a direct and proximate result of Defendant's violation Plaintiff has sustained embarrassment, stress, distress, mental, emotional, physical, and financial damages and continues to suffer with the humiliation of being fired/terminated.

## II.   COUNT TWO
### Intentional Infliction of Emotional Distress
### (Restatement (Second)Tort §46 cmt.d (1965))

130. Plaintiff re-alleges and incorporates by reference paragraphs  as if fully set herein.

131. Defendant did engage in reckless, malice, and odious behavior with the intent to cause additional psychological harm and distress to Plaintiff when they retaliated, harassed, bullied, intimidated and terminated her:

a) No one, especially excellent employees wants to be fired. The Defendant with malice and reckless intent to harm and cause distress, did intentional inflict distress on the Plaintiff when they retaliated against her and changed her retirement to a termination under the guise of a coding error resignation after she retired.

Defendant has established a pattern of bullying, intimidation, deception of facts/lies in order to inflict distress where Plaintiff was most vulnerable—her impaired mental and emotional condition.

(b) The Defendant did act with malice when they, knowing Plaintiff's fragile psychological state did bullied and intimidate when they refused to adjust their unwritten policy, and subjected her to participate in reasonable accommodation interactive dialogue sessions alone with between five and six individuals representing the Defendant's interest and no one specifically in attendance to help her; one of the times was within days of her learning of her mental health provider, Dr. Terry Orme's sudden death.

c) Knowing the Plaintiff disability, the Defendant did not initiate the ADA interactive process and ceased the process early without undue hardship and refused Plaintiff's initial request to be considered for the process, instead they offered termination;

d) Defendant did threaten to fired Plaintiff even though she was been in compliance with mutual agreed actions.

e) Defendant ceased the accommodation without genuinely engaging in the interactive process and denying her need for additional time because of the untimely death of her mental health provider, search for new provider, insurer denial of payment to new provider that caused Plaintiff's mental health treatment to be interrupted again after it had just restarted.

f) Refusing to end one of Plaintiff's legal nightmares by continuously presenting her with unlawful settlement agreement in order to resolve her workers' compensation case.

g) Defendant ignored her requests for intervention as well as those of her advocate to cease the continuous omissions of information, inaccurate, discrepancies', distortions of fact/lies to Plaintiff.

h) November 2013 Defendant's agent with the Defendant's knowledge did cease her mental health treatment without consulting Dr. Fresh, her mental health provider, within about 10 days of Plaintiff's October 31, 2013 refusal to Plaintiff's to sign a settlement agreement again

stating that she resign (she was already retired or so Plaintiff believed) and waiving all legal rights and protections.

132. Plaintiff she stood in continuous opposition signing Defendant's unlawful settlement agreements which would cause her to discriminate, oppress, and cause harm against herself.

133. Defendant did create coding error resignation excuses as a pretext to justify their unlawful termination in retaliation to Plaintiff's participation in protected activities and opposition to unlawful discriminatory oppressive activities.

134. Defendant has known since 2006 as a result of Plaintiff's work injury that she is particularly susceptible to emotional distress because of her PTSD, depression, and anxiety.

135. There is close proximity of events and incidents or coincident that connects Plaintiff's refusal to resign and Defendant's discovery of a coding error resignation after she retired and Defendant's inability to directly achieve Plaintiff voluntarily resigning.  There is a causal connection between:

(a) The July 15, 2013 letter written to defendant to address the retirement confusion,

(b) and July 16, 2013 Plaintiff is again presented with Defendant's settlement agreement to resign,

(c) July 30, 2013 Plaintiff believes she has retired.

(d) Plaintiff files EEOC complaint August 20, 2013.

(e) October 31, 2013 Plaintiff is again asked to sign Defendant's settlement that she resigned on the date she signed.

(f) When Plaintiff could not sign, lawyer withdraws legal service and in less than two weeks Defendant's insurer with Defendant's knowledge closes Plaintiff mental health services without consulting Dr. Fresh her doctor.

(g) January 2014, Plaintiff, receives her file, and finds letter from Defendant's lawyer to her former lawyer, about a coding error resignation.

97.   After Plaintiff learned her retirement was change to termination under the auspice of resignation and her medical treatment ceased by the Defendant and their insurer, she withdrew back into her shell of isolation.

136. Plaintiff slept even less, stayed in bed for days, cried more, was angry, she ate less causing her metabolism to slow down and her to gain weight.

137. Termination is severe, especially an unwarranted one, however, a termination after someone retires or believes they have retired makes the Defendant's conduct beyond outrageous, and it was odious.

138. As a direct, proximate, result and foreseeable consequences the Defendant's conduct caused the Plaintiff to suffer damages in the form of additional emotional and mental distress and anguish, physical pain and suffering, and embarrassment---she was fired.

139. Defendant did not exercise reasonable care to prevent or correct promptly any discriminatory, abusive, bullying or retaliatory conduct.

140. Plaintiff made several attempts to prevent and correct Defendant's odious and reckless behavior to avoid additional and continuous harm.

141. Defendant's retaliatory, harassing, intimidating, and coercing conduct constitutes the intentional infliction of emotional distress on an individual who was already psychologically vulnerable.

142. Defendant acted with a conscious disregard of Plaintiff's mental health condition/disability and rights, with intent to vex, injury, and cause the Plaintiff distress and extreme stress and anxiety and undermine Federal laws.

### III. COUNT THREE
### Retaliatory Harassment Discrimination – ADA

143. Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein.

144. Defendant's pattern and continuous actions of psychological abuse/bullying and intimidation toward the Plaintiff began in November/December 2005 however; it became more intense and insufferable from January 2012 to January 2014.

145. Defendant did repeatedly subject Plaintiff to psychological abuse/violence/bullying aimed directly at her mental and emotional impairment.

146. Defendant's numerous and continuous distortions of fact, outright lies, discrepancies, inaccurate and omission of information created constant confusion, stress and distress, and formed a pathological atmosphere of deception and misrepresentation—reasonable people do not

function well nor desire to be a situation that condones continuous blatant deceptions — lies.

147. Defendant's actions caused the Plaintiff to constantly experience more stress, confusion, be on edge, and be in an even more precarious mental and emotional state and under distress.

148. Defendant's continuous unwelcomed abusive behavior had an adverse impact on Plaintiff's mental, emotional, and physical health--- memory, thinking, concentrating, sleeping, and eating---treatment and healing efforts.

149. Plaintiff and one of her advocates sought intervention from Defendant's CEO Mr. Anderson and others, the psychological violence did not stop, it continued to the point that someone in the Defendant's employ changed Plaintiff's retirement to a termination under the auspice of a coding error resignation after the Plaintiff retired.

150. If Plaintiff had signed the unlawful settlement agreement then the resignation could have been an accurate reflection, however, Plaintiff did not sign the agreement she was being coerced to sign, therefore, resignation is not an accurate indicator of Plaintiff's actions.

151. Defendant's lack of adequate action and silence condones a work atmosphere so charged and pervasive with lies that left Plaintiff, who was already psychologically mentally and emotionally vulnerable and struggling for mental and emotional balance, more distressed, intimidated, and confused.

152. Plaintiff was drowning in deception and Plaintiff could no longer handle the constant psychological abuse/violence/bullying caused by the continuous lies and making up employment practices and passing them off as policy as a requisite to continued employment and was thus forced to retire.

153. As a proximate result of Defendant's actions Plaintiff experienced additional mental and emotional anguish, confusion, stress and distress.

154. Defendant's continuous distortions of facts/lies contributed to and further exacerbated Plaintiff's belief that Defendant did not want her as an employee, did not care about her wellbeing, and was attempting to cause her harm.

155. She was suffering, although she could not articulate it, she felt as though she was drowning and no one knew.  Her silent hopes, slowly

made way to a crushing reality Defendant's abuse is not going to change;
she wanted to heal as best as she could and Defendant's behavior was
standing in the way of her healing and recovery efforts and therefore back-
to-work effort.

156.  Defendant did not exercise reasonable care to prevent or correct
promptly any discriminatory, abusive, bullying or retaliatory conduct.

157.  Plaintiff as her advocate Helen Huyler made a number of
attempts to prevent and correct Defendant's odious and reckless behavior to
avoid additional and continuous harm.

158.  **HARM TO PLAINTIFF**

## IV.    COUNT FOUR
### Retaliatory Harassment Hostile Work Environment)
### 42 U.S.C. §12203 – Prohibition Against retaliation and coercion
### 42 12112(a) ADA ????

159.  Plaintiff re-alleges and incorporates by reference paragraphs as
if fully set herein

160.  Plaintiff incorporates Count Three causation also into Count
Four.

161.   Defendant creation of a pathological deceptive work/return-to-work environment was hostile.  No one is comfortable around people who are constantly lying.

162.   Lying caused the Plaintiff to feel confused, doubt herself, insecure, and made her feel unsafe and unable to trust.

163.   Defendant actions interfered with Plaintiff's mental and emotional restorative process and thus also with her return-to-work efforts.

## V.   COUNT FIVE
### Constructive Discharge
### (Retaliation Discrimination)

164.   Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

165.   At all time during the Plaintiff's employ she was an excellent employee.  She performed her duties with pride, great care, sincerity, integrity, utmost diligence and competence toward passengers, fellow crew, fellow employees, and the company itself.

166.   Plaintiff believes the Defendant has established a pattern of psychological abuse/violence/bullying through their continuous actions and inactions that foster the development of a pathological atmosphere of

intention deception, as indicated in Counts Three and Count Four re-alleged and incorporated here in Count Five.

167. Plaintiff contents that Defendant knowing her psychological impairment of PTSD, depression, and anxiety did begin a campaign to force Plaintiff to resign voluntary after they learned in November 2011 that her disability would not allow her to work as a full status flight attendant.

168. After the NWA Flight Attendant contract expired in December 2011, the Defendant began to feed Plaintiff with misinformation, incorrect statements, discrepancies, distortion of facts/outright lies which created confusion, stress and cause Plaintiff duress under which Plaintiff was expected and to make decisions.

169. Most people can endure an occasional lie. No one wants to be around habitual liars and dishonesty.

170. Defendant intentionally created and contributed though their silence and inaction to effectively remedy the situation a toxic work atmosphere for the Plaintiff that laced with discrimination, harassment, retaliation, interference, coercion, bullying, and intimidation, psychological abusive/violence and deceptions, misinformation, and distortions/outright

lies that created pathological deceptive work conditions so intolerable that Plaintiff had no alternative but to retire.

171. Within a nine month period in 2012, the Defendant did unlawfully threaten Plaintiff with termination.

172. Within a the same period Defendant did:

a. Defendant attempt to force the Plaintiff to resign, by denying her request to be considered for reasonable accommodation or retirement instead the pending termination guised under "deemed to be voluntary resigned" because of her inability to return to full flying status.

b. Defendants' option to Plaintiff was coerced resignation by signing an unlawful settlement agreement, thereby, agreeing to resign and waive legal rights and protections or leave MN mediation conference and face termination.

c. Defendant did Subject Plaintiff to participate alone—without an advocate as she and her doctor requested with five/six individuals representing the Defendant and no one representing her interest—in two interactive dialogue reasonable accommodation, one of which was held within days of learning of her mental health provider unexpectantly dying.

d.  Defendant did create a pathological deceptive atmosphere that condone lies: Defendant provided Plaintiff with three letters/emails that contained outright lies, discrepancies, inaccurate information, omission of information to which Plaintiff was required to make decisions and take actions.

e.  Defendant did want Plaintiff to ignore her mental provider's assessment of her conditions and the necessary parameters needed for her accommodation.

f.  Defendant did lie and say they had not received information from Plaintiff.

g.  Defendant did lie when they said they FedEx information to Plaintiff's P.O. Box.

173.  By the Defendant's actions, inactions, distortions of facts/lies, intentional deceptions and all the other aforesaid acts of mental and emotional behavior, Plaintiff has been directly and legally caused to suffer the harm and damages.

174.  Plaintiff believes and alleges Defendant's acts were done with malice, with fraudulent, oppressive and wrongful intention of injuring Plaintiff.  Defendant did act with improper and evil motive amounting to

malice and in conscious disregard for Plaintiff mental and emotional vulnerability and impairment, and rights.

175. Because the acts were carried out by managerial employees acting in a deliberate, callous, calculated and intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover all damages available under the law.

176. The inconsistent, accurate, and outright deception created undo additional stress for the Plaintiff, as her mental health treatment had been interrupted twice in less than four months, and she was still vulnerable and fragile after the sudden death of her mental health provider.

177. No one likes to be lied to, most people do not want to be around liars because you do not know when they are telling the truth and it becomes hard to trust them.

178. When a person's mental and emotional state has been or is compromised that distortion of facts make things very difficult for them to feel and be safe and to think.

179. Defendant failed to provide Plaintiff a safe hostile free environment that they espoused to embody. The Defendant knew of the harassing behaviors yet did little to nothing to cease the actions.

180.     The Defendant's actions were retaliatory harassment in nature and go against good faith and fair dealing practices in employer/employee relationship, moreover the actions were in violation of Title VII.

181.     The Defendant's actions and inactions were of such that a reasonable person in a similar situation would feel compelled not to report any wrong doings and suffer in silence or be forced to remove themselves from the situation.

182.     The Defendant's action/inaction was impeding Plaintiff's mental health healing efforts and thus her back-to-work effort.  Plaintiff was forced to into a constructive discharge via retirement.

## VI.     COUNT SIX
### (Failure to Accommodate)

183.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

184.     Defendant knew or should of known of Plaintiff's disability status because Plaintiff was required to submit monthly doctor's notes to Defendant; because of the workers' compensation claim; and monthly reports from Fran Williams.

185.    Defendant denied Plaintiff's and her doctor's requests to have an advocate participate in the Defendant's interactive process.  Providing this accommodation would have allowed Plaintiff to really be a participant in Defendant's interactive dialogue.

186.    Plaintiff under duress participated in two meetings with five/six individuals representing the Defendant's interest.  As a result of no one allowed who was solely invested in Plaintiff's interest, Plaintiff was overwhelmed, in distress, felt intimidated, and bullied.

187.    Defendant denial of Plaintiff's extenuating circumstances that required an extension of unpaid leave caused Defendant to not genuinely participating in Plaintiff's return-to-work efforts, suggest termination, and cease the reasonable accommodation process early.

188.    Defendant did initiate a call to Plaintiff ignoring Plaintiff's request to put information things in writing, because of their habitual lying. The call caused Plaintiff undue stress, and triggered a flash back to 9/11 when the same Sue McGlone, lied to her and caused her to lose her trip, money, and sit on reserve.

189.    Had Defendant fully and genuinely followed their own harassment philosophy and protected Plaintiff, she would not have suffered

needless psychological abuse nor subjected to participating alone an interactive dialogue with five/six people representing the Defendant and in which she could not be a full participant.

190.    Providing the Plaintiff's accommodation would not have caused the Defendant undue hardship.

191.    Plaintiff asked about non-flying flight attendant positions and was informed they were short lived, required certain qualification, and were unavailable to her.  Defendant did provide evidence that Plaintiff's access to those positions would cause them undue hardship.  They provide evidence that Plaintiff would be unable to perform the essential functions of the positions.

192.    Defendant was in violation of EEOC Guidelines Workers' Compensation and ADA #22 employer must reassign an employee who is no longer able to perform the essential functions of his/her original position, with or without a reasonable accommodation because of a disability-related occupational injury.

193.    Defendant does have non-flying Special Assignment to which Plaintiff may have qualified.  Defendant did not offer Plaintiff reassignment

consideration or any possible positions.  Defendant only offered the Plaintiff to compete for positions.

194.    Defendant did refuse to modify its policies, practices, and procedures in accordance to ADA.

195.    Providing any and all of the accommodations were reasonable and would have been reasonable and would not have caused Defendant undue hardship.

196.    Failure to accommodate inflicted additional stress on Plaintiff, and caused her mental and emotional anguish unnecessary and severe emotional distress to the point of breaking down crying.

## VII.    COUNT SEVEN
### (Failure to Initiate an Informal Interactive Process)

197.    Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

198.    Defendant knew Plaintiff had a disability and was unable to return to full flight attendant status.

199.    Defendant did fail on January 19, 2012 and prior to initiate an informal interactive process to help Plaintiff in determining return-to-work options.

200.     Defendant did refuse Plaintiff's request to be considered for reasonable accommodation and begin the accommodation process.

201.     On January 19, 2012 Plaintiff was forced to return from a MN mediation conference with the Defendant in tears and in mental and emotional anguish and distress to face her pending termination because she was unable to return to full Flight Attendant flying status.  To which the Defendant knew she was unable to do prior to the conference.

## VIII.   COUNT EIGHT
### (Interference – Title I ADA)

202.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

203.     The ADA prohibits interference with the exercise or enjoyment of ADA rights, or with the assistance of another in exercising or enjoying those rights.

204.     Plaintiff was participating in a protected activity when she requested Defendant to consider her for reasonable accommodation.

205.     Defendant did intentionally harass, intimidate, and bully her each time she was asked sign their settlement agreement with unlawful provisions that interfered with Plaintiff exercising ADA protections and

rights in order to resolve her workers' compensation case is prohibited under ADA.

206.    Defendant repeatedly attempted to interfere with Federal rules and status that protected Plaintiff and held Defendant accountable for misconduct.

207.    Each time Defendant presented Plaintiff with a settlement agreement that were not only interfering with ADA, requiring Plaintiff to sign settlement agreements in order to resolve her workers' compensation case also constitutes coercion.

208.    Defendant continuously refused to allow Plaintiff to resolve her workers' compensations claims unless she signed unlawful settlement agreement that interfere with her exercising EEOC and ADA rights and protections.

209.    Threatening to withdraw settlement offers if they were not agreed upon within a short period of time is also adverse treatment. Defendant's policy/requirement that limited Plaintiff's rights to invoke ADA protection and rights is in violation of ADA.

210.     Defendant's coercive and intimidating actions cause Plaintiff mental and emotional anguish and distress.     Plaintiff lived in constant uncertainty and fear that she would be terminated at any time.

211.     Plaintiff has suffered economic hardship, emotional and mental distress and anguish, embarrassment.

212.     Defendant's actions constitute blatant disregard and respect for Federal law; as well as individuals who suffer from mental and emotional impairment.

## IX.    COUNT NINE
### (Interference – EEOC Title VII of the Civil Rights Act as amended)

213.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

214.     Plaintiff is a member of multiple protected classifications, race, gender, age, and disability.

215.     Defendant's practice of requiring Plaintiff to sign/agree to the terms of a settlement agreement that interferes with Federal protections and rights is unlawful did intentional harass and cause Plaintiff distress.

216.     Each time Defendant presented Plaintiff with a settlement agreement was not only interfering with EEOC rights and protection,

requiring Plaintiff to sign settlement agreements in order to resolve her workers' compensation case constitutes coercion.

217.     Defendant continuously refused to allow Plaintiff to resolve her workers' compensations claims unless she signed unlawful settlement agreement that interfere with her exercising EEOC and ADA rights and protections.

218.     Plaintiff has suffered economic hardship, emotional and mental distress and anguish, embarrassment.    Defendant's coercive and intimidating actions caused Plaintiff mental and emotional anguish and distress.  Plaintiff lived in constant uncertainty and fear that she would be terminated at any time.

219.     Defendant's actions constitute blatant disregard and respect for Federal law; as well as individuals who suffer from mental and emotional impairment.

## X.    COUNT TEN
### (Failure to Engage in Good-Faith Inactive Process)

220.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

221.   Defendant did not genuinely fully engage ADA's interactive process for reasonable accommodations.

222.   Defendant initially decline to engage in the process. Once the process began, there was a delay in Plaintiff receiving the paperwork, Plaintiff was denied an advocate and had five to six individuals representing their interest in a conference with the Plaintiff, and Defendant did cease the process early without input from Dr. Fresh. And in disregard to Ms. Williams, keeping them informed of Plaintiff's actions.

223.   Defendant had full knowledge that Plaintiff's medical management and return-to-work efforts were stalled because of Plaintiff's doctor's untimely death caused her treatment to temporarily cease while she searched for a new provider, after she had secured a new provider and begun treatment, her mental health service were interrupted again when the declining to pay Plaintiff's new provider Dr. Edith Fresh, then requiring the Fresh to submit medical reports/notes with every bill in order to receive payment, did case Plaintiff's mental health treatment to be interrupted again until Defendant's insurer paid, Plaintiff's bill.

224.     Every time Plaintiff's had to begin with a new mental health facilitator, her treatment would begin again at the origins of her injury, which would cause Plaintiff to drop into a depressive state, crying and

225.     Defendant did not wait for Fresh to finish her assessment.

226.     Defendant threatening Plaintiff for something she did not do, and indicating they were ceasing the process early caused Plaintiff to lose more hope.  Her life—her dream career lost; her home lost; her twenty-five year identity lost; her world as she knew it, her future as she dreamed it, lost.

## XI.    COUNT ELEVEN
### (Failure to Engage In Good-Faith and Fair Dealings) ---include breach of contract – agreed in writing Plaintiff was eligible to retire

227.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

228.     Defendant did create a contract with Plaintiff when they inform her orally, in writing, and employee portal that she was eligible to retire.

229.     Defendant agreed in writing that Plaintiff could and would retire on July 30, 2013.  Plaintiff did follow all Defendant's retirement instructions.

230.     Defendant did continuously ignore the written agreement and continued to subject Plaintiff to settlement agreements requiring her to resign after they agreed to the July retirement.

231.     Defendant did unfairly breach their written promise that Plaintiff could retire, and did not engage in good-faith and fair-dealing when they changed her retirement to termination under the auspice of resignation, after she retired.

232.     As a result of Defendant's retaliatory behavior Plaintiff did and continues to suffer mental and emotional anguish, embarrassment, humiliation of being terminated

## XII.   COUNT TWELVE
### (Disability Discrimination ADA)

233.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

234.     Defendant did make a difference with Plaintiff, because of her work-related disability required an inactive status.

a. Defendant did count Plaintiff's time on inactive status against her, and refused to provide Plaintiff with NWA and Delta's written policy that supports the exclusion.

b. Defendant denied Plaintiff their Disability Medical Leave which she qualified.

c. Defendant denied Plaintiff the ability to retire and their retirement benefits.

d. As a result of her disability Plaintiff was denied participation in employee profit sharing and or other employment bonus/benefits that were terms and conditions of employment.

e. Defendant denied Plaintiff consideration to non-flying flight attendant special assignment positions.

f. Defendant denied Plaintiff access to retiree medical, dental, and vision coverage.

235.    Plaintiff suffered mental, emotional, physical, and financial hardships and embarrassment from Defendants discriminatory actions. Plaintiff gained weight, loss confidence, loss the life she knew.

## XIII.    COUNT THIRTEEN
### (Discrimination for Engaging in Protected Activity)
### §2000e-3  §704 Title VII Discrimination

236.  Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

237. Plaintiff is African American, female, over 40, and disabled and was subjected to retaliatory harassment discrimination for engaging in protected activity.

238. Defendant did not inform Plaintiff that they had a Disability leave.

239. Defendant did not classify Plaintiff under their Disability Leave in accordance to their workers' compensation policy.

240. Plaintiff's workers' compensation injury, in accordance to Defendant's written policy, qualified her Defendant's Disability Leave. Liberty Mutual as well as Sedgwick recognized her disability and therefore, she was eligible for Unpaid Approved Disability Leave.

241. Plaintiff believes Defendant neglected to inform her or provision her under the Disability Leave in order to punish and retaliate against her for:

  a. Participating in protected activities;

  b. Requesting and participating in reasonable accommodation process,

  c. Opposing participating in Defendant unlawful action of interference with Federal protections and rights;

  d. Complaining to Defendant's former CEO; and

e. Filing and continuing to diligently pursue a workers' compensation claim.

242.   Defendant's action not to classify under their Disability Leave did deny Plaintiff benefits she had rightfully earned through her work injury, her disability, and years of and of service.

243. Plaintiff was subjected to constructive discharge, denial of retirement benefits earned, and the privilege of retiring with 25 plus years of service with honor and dignity that reflect her excellent work history.

244.  Instead Plaintiff was tossed out of Defendant's door in shame like wet garbage, nothing to show from her quarter-of a century of continuous service.

245.   She has no medical, dental, vision, retiree ID badge, parking pass, no life insurance, or any retirement benefits that are reflected in Defendant's disability leave policy.

246.   Disability leave remains available to Flight Attendants who are injured on-the-job and their injury was certified by Liberty Mutual and or Sedgwick.  Placement on Disability Leave is Defendant's policy not practice.

247.   Defendant's negligence caused Plaintiff additional stress, mental and emotional anguish, embarrassment.

248.    Economic loss, denial of bonus and employee profit sharing,

249.    In January 2012 Defendant refused Plaintiff's request to consider her for reasonable accommodation and engage Plaintiff in an interactive process.   Plaintiff's request to defend triggered her protection under ADA protected activity.

250.    Defendant did not change their denial of Plaintiff's request until February 2012 after their refusal to engage in reasonable accommodation process was reported to MN department of Labor.

251.    Defendant did deny Plaintiff's doctor, Dr. Terry Orme's request to be included in the process and also Plaintiff's request for an advocate to participate in Defendant's interactive process.

252.    Dr. Orme died unexpectantly, after the beginning of the process. Defendant attempted to force Plaintiff to continue the process and defy Dr. Orme's orders.

253.    Plaintiff was ill-equipped to participate in the process within days of learning of Dr. Orme's death.   Plaintiff needed time to locate a new provider.   Plaintiff notified Defendant in August about her new doctor. Plaintiff treatment ceased again after Defendant's insurer refused to pay the

medical provider's bills unless a medical report was submitted with each bill.

254.   Within about two weeks of Plaintiff complaining to Ms. Greene that her new doctor was not receiving payment for the mental health treatment she had provided, Ms. Greene sent Plaintiff a letter dated October 3, 2012 that the accommodation process was ceasing because Defendant was unable to accommodate Dr. Orme' work restrictions.   Defendant did not allow Dr. Fresh time to establish a rapport with Plaintiff and devise a treatment plan based on her observations.

255.   Defendant did cease the process without genuinely making a good faith effort to work with Defendant's new provider for accommodations;

256.   Defendant did not reassign Plaintiff in accordance to the worker's compensation and ADA guide, nor did Defendant provide Plaintiff with essential functions of any position;

257.   Defendant denied Plaintiff access to non-flying special assignment positions, which would have been in the field that she had over twenty-five years of knowledge and experience.

258.   Defendant failed to engage the interactive process in good faith when they cut the process short and failed to follow-through with Fran Williamson's progress notes, and by not offering reassignment, denying Plaintiff's request to be consideration for non-fly special assignment positions, and not allowing Plaintiff's new provider time to devise a plan.

259.   Plaintiff could have been reasonably accommodated, without causing Defendant undue hardship, but for the employer's lack of good faith effort.

### XIV.   COUNT FOURTEEN
### (Violation of the Rehabilitation Act of 1973, U.S. § 701 and § 503)

260.   Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

261.   The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., applicable to federal employers and to employers receiving federal funding/contracts.

262.   Defendant does have Federal government funding/federal contracts via mail service and government rates for Federal employees, Defendant's actions of interference, harassment, retaliation, coercion,

bullying, intimidation,    and discrimination toward the Plaintiff are in violation of the Rehabilitation Act of 1973.

263.     As a result of Defendant's egregious actions Plaintiff is entitled to compensatory and punitive relief according to Title VII

### XV.    COUNT FIFTEEN
### (Disparte Treatment ADA – §12112 )

264.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

265.     Defendant's denial Plaintiff access to have her doctor consider non-flying flight attendant special assignment positions for which she may be best qualified was in violation of ADA.

266.     Defendant's rejection of Plaintiff's request to access to positions in the Department and being considered for assignments that her twenty-plus years of service and knowledge would have better qualified her to the enjoyment of the privileges of employment was discriminatory in nature.

267.    Defendant did not offer a non-discriminatory reason to their denial.

268.     Defendant did not state that modifying a company policy or practice to accommodate the Plaintiff in any position would cause them undue hardship.

269.     If it were not for Plaintiff's disability she would have had access to the non-flying special assignment positions.  In general these positions are low stress and include and are not limited to public relations at community and other company events, conferences, summer camps, speaking at schools about Flight Attendant career, and helping with interviewing process.

270.     Defendant's denial caused the Plaintiff to sink into a quiet despair, her last glimmer of hope to continue as a flight attendant, her child dream career were dashed, she withdraw into a shell, that she did not realize until she began to write this second amended complaint.

271.     Plaintiff still suffers in silent despair, bogged down in lies, bullying, mental and emotional harassment and anguish and deep pain.

## XVI.     COUNT FIFTEEN

### (ERISA Interference)

272.     Plaintiff re-alleges and incorporates by reference paragraphs as if fully set herein

273.     Plaintiff was a twenty-five plus year employee of the Defendant exercising EEOC and ADA rights and protections.

274.     When Defendant interfered by going against their own disabled worker' policy and changed her NWA Disability Medical Leave status to Approved/Unapproved Medical Leave Absence instead of Disability Leave without merit it interfered with the Plaintiff's rights to ERISA benefits including and not limited to dental, medical, vision, and other unknown retiree benefits.

275.   Defendant was in violation of Title VII of EEOC.

276.     In all the foregoing causes of actions there is causal connection. The Defendant's actions are linked by close proximity of time and suspiciousness of circumstances.  Defendant has tried to coerce Plaintiff into resigning from 2008 through unlawful settlement agreement to two weeks of her July 30, 2013 retirement date.

277.     When Plaintiff maintained her oppositional stance and refused to resign or participate in unlawful actions and complained to the Defendant's former CEO, her NWA Disability leave which would have allowed her to retire was changed to a non-disability leave.

278.     Her agreed retirement changed to a resignation, however, the Defendant's human resource department has yet to contact her, and her legal efforts to secure an answer have not been successful.   The time period between Plaintiff reporting harassing behavior to EEOC, her retirement, the changing of retirement to termination via a coding error resignation, losing legal representation, losing mental treatment and her finding out about the change was six months.

**18)**   Plaintiff No longer works for the Defendant

**19)**   This is a disability claim, and Defendant has deny a request for reasonable accommodation? Yes, Defendant ignored Plaintiff's request to cease retaliatory, harassing, and intimidating behaviors that were impeding her psychological recovery efforts.

**17) If it should go to trial, Plaintiff requests a Jury Trial.**

## PRAYER FOR RELIEF

As   relief   from   the   allegations   of   discrimination,   retaliation, harassment, interference, bullying, coercion, psychological abuse/violence/ bullying stated above, Plaintiff respectfully and humbly prays that this Court grant the following relief:

(a) Grant judgement in favor of the Plaintiff and declare the Defendant has violated Title I of Americans with Disability Act as amended 1990, Title III of Civil Rights as Amended, Restatement (Second) Tort §46 cmt.d (1965), and the Rehabilitation Act of 1973, 29 U.S. **§701, §503.**

(b) Require Defendant to apologize to Plaintiff for their maltreatment.

(c) Punish Defendant severely so they will curtail their pathological distortion of facts/lying stop lying, misrepresenting information and facts they subjected Plaintiff to endure.

(d) Order Defendant to put in place safe-guards to cease this behavior from happening again and match their elegant ideological words with their actions.

(e) Order Defendants to initiate sensitivity training about mental health disabilities and be more sensitive, especially when people have been injured on the job and loved their career, an injured employee who loves their career.

(f) Require Defendant to modify their policies, practices, and procedures so as to bring their practices and policies into compliance with Title I of ADA and its accompanying regulations, including but not limited

to implementing a policy to reassign qualified injured employees with disabilities to vacant positions for which they are qualified without competition for the position, when no accommodation is available in the current job.

(g) Order Defendant to train their supervisors and human resources staff regarding the requirements of ADA;

(h) Order Defendant's from failing or refusing take other appropriate measures to overcome the effects of their discriminatory policies and practices:

(i) Order Defendant and should there be any future successors to make Plaintiff whole and award Rev. Burdette Lowe and the Order cannot be breached without severe consequences to the Defendant and their successors:

(a) Full retiree status with retiree benefits including retiree ID badge, retiree plaque and other anniversary markers of employment she was denied.

(b) An Atlanta parking decal,

(c) S2 or higher management boarding priority for her and individuals listed under her travel passes, for no less than 20 years

Page **71** of **76**

(d)    Order Defendant Order Defendant to pay for Plaintiff's retiree health, dental, and vision insurance premiums from policies they offer other employees including the pilot group that she shall select from,

(e)    Order Defendant to not harass Plaintiff.

(f)    Order that if Plaintiff has to take the Defendant back to court for breaching any part of the Order Defendant is responsible for the Plaintiff's entire attorney's costs, fees and expenses.

(g)    Provide Plaintiff with paid life insurance coverage

(h)    Provide Plaintiff with the employee bonuses, and profit sharing to which she would have been entitled based on her last full year of working salary of about $60,000 with inflation and cost of living modification to bring in better in line with inflation.

(i)    Order Defendant to contact their CIGNA the NWA insurer and order them to make good on the $10,000 Plaintiff was entitled because of her disability injury and was denied.

(j)    Order Defendant to provide Plaintiff with employee bonus and profit sharing based on her last full year of work earnings of about $60,000 adjusted for time passed and cost of living increases.

(k)  Plaintiff is entitled to compensatory, punitive, injunctive, and any other damages in an amount the Court believes is appropriate to punish the Defendant for their wrongful conduct, set an example for others, and deter Defendant from continuing such behavior.

(l)  Plaintiff request cost and fees involved with litigating this case and her employment case.

(m) Plaintiff requests any such additional relief that may be appropriate.

Plaintiff has reviewed Rule 11 of the Federal Rules of Civil Procedure regarding good faith in filing this Complaint and any motion or pleading in this Court, as well as the sanctions that may be imposed by the Court when a litigant (whether plaintiff or defendant) violates the provisions of Rule 11. These sanctions may include an order directing me to pay part or all of the reasonable attorney's fees and other expenses incurred by the defendant. Finally, it the defendant is the prevailing party in this lawsuit, costs (other than attorney's fees) may be imposed upon me under Federal Rule of Civil Procedure 54(d)(1).

Signed, this _____6_____ day of <u>March , 2017</u>

_____
Signature, Plaintiff *pro se*

_____<u>Burdette Lowe</u>_____
Printed Name of Plaintiff, *pro se*

<u>P.O. Box 92421</u>_____
(Street Address)
<u>Atlanta, GA 30314</u>_____
(City, State, and Zip Code)
<u>Skyburdie23@aol.com</u>
(email address)
<u>(678)570-7721</u>
(telephone number)

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1

**The undersigned hereby certifies that the foregoing document has been**

**prepared in accordance with the font type and margin requirements of**

**Local Rule 5.1 of the Northern District of Georgia, using a font type of**

**Book Antiqua and a point size of 13.**


_Burdette D. Lowe, Plaintiff_ *pro se*

**P.O. Box 92421**

**Atlanta, GA 30314**

**(678)570-7721**

**Sskyburdie23@aol.com**


Plaintiff reserves the right to amend or supplement this disclosure as provided by Fed. R. Civ. P. 26(e) and to object to the admissibility of any document or statement herein or in Defendant's initial disclosures on all bases set forth in the Federal Rules of Civil Procedure, Federal Rules of Evidence, and governing law.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Plaintiff's Opposition to Defendant's Summary Judgement and all Exhibits have been served of Defendant's counsel of record, Mr. Tom Munger, via the Federal Clerk for electronic submission and U.S. mail to located at 999 Peachtree Street, NE, Suite 2850, Atlanta, GA 30309.

Respectfully and humbly submitted by:

Burdette Lowe
Plaintiff *pro se*
P.O. Box 92421
Atlanta, GA 30314