IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BURDETTE LOWE, | : CIVIL ACTION NO. |
| | : 1:16-CV-3717-TWT-JSA |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| DELTA AIRLINES, INC., | : |
| | : **FINAL REPORT AND** |
| Defendant. | : <u>**RECOMMENDATION**</u> |

Plaintiff Burdette Lowe, proceeding *pro se*, sues her former employer, Delta Airlines, Inc. ("Delta" or "Defendant"), alleging discrimination on the grounds of disability in violation of the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), and retaliation in violation of the ADA and/or Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

This case is before the undersigned on Defendant's Motion to Dismiss [9], Plaintiff's Motion in Opposition [17], and Plaintiff's Emergency Motion for Extension of Time to File Second Amended Complaint [21]. For the reasons stated below, the undersigned **RECOMMENDS** that the Motion to Dismiss [9] be **DENIED AS MOOT**, that Plaintiff's motions [17] [21] be **DENIED**, and that this case be dismissed for Plaintiff's failure to follow a court order to re-plead with a Complaint that states a viable claim.

# I.    PROCEDURAL HISTORY

The circumstances that bring the Court to consideration of the above-listed motions are confusing. Plaintiff brought this case by way of an application for *in forma pauperis* status dated October 5, 2016 [1]. Less than one week later, on October 11, 2016, Plaintiff submitted another complaint, also against Defendant Delta Airlines, Inc., which asserted some overlapping but also some potentially different claims appearing to be based on much of the same set of facts. The second case was filed under the separate docket number, Civil Action No. 1:16-CV-3765. While the second case (the 3765 case) was also assigned and referred to the undersigned U.S. Magistrate Judge, it was assigned to a different presiding U.S. District Judge (Judge Richard W. Story) than the Judge assigned to the instant case (Chief Judge Thomas W. Thrash).

On December 22, 2016, Defendant filed a Motion to Dismiss the instant case [9], and separately moved to dismiss the 3765 case on January 17, 2017. Plaintiff did not specifically respond to the Motion to Dismiss [9] but instead filed an Amended Complaint on January 17, 2017 [16].[1]

---

[1] Rule 15(a)(1) allows a plaintiff to file an amended complaint once as of right, within 21 days of service of a motion to dismiss under FED. R. CIV. P. 12(b). Here, Defendant's Motion to Dismiss was filed on December 22, 2016. Because Plaintiff's 21-day deadline to amend was expressed as running from the date of service, not the filing date, and because Defendant served the motion by mail, *see* [9-1] at 22, three days are added to the 21-day period, beginning on the day after the filing. The resulting deadline fell on January 15, 2017. However, because that day was a Sunday, and the following day was a federal holiday (in honor of Dr. Martin Luther King, Jr.),

In the meantime, the undersigned became aware of the existence of these two overlapping but not entirely co-extensive cases filed roughly simultaneously by Plaintiff against the same Defendant. Accordingly, on January 25, 2017, the undersigned issued an Order and Report and Recommendation in both cases (1) recommending that the later-filed 3765 case be dismissed, and (2) ordering Plaintiff to file a Second Amended Complaint in the instant case. *See* Order [20] at 2. The Court ordered that such an amended complaint be filed "**WITHIN TWENTY-ONE (21) DAYS OF THIS ORDER**". Order [20] at 2 (emphasis in original).[2] In addition to giving Plaintiff the opportunity to add her claims from the 3765 case into this case, the Order made clear that Plaintiff needed to better plead the factual support showing a plausible basis for her claims and to specifically delineate each separate claim and the legal basis for such. *Id.*

Nothing was filed within 21 days of the Order. Twenty-*eight* (28) days later, on February 22, 2017, Plaintiff filed a motion requesting ten additional days to file her Second Amended Complaint. [21]. Plaintiff stated that the need for this extension arose from her elderly mother's medical emergency on Sunday, February 19, 2017. That emergency occurred 25 days after the Court's January 25 Order.

---

Plaintiff's filing of her Amended Complaint on January 17, 2017 was timely.

[2] The recommendation to dismiss the 3765 case was subsequently adopted by Judge Story and that case has since been dismissed.

Defendant objected to the Motion for Extension. Defendant stated that it would have readily agreed to any delay necessitated by the medical emergency, but argued that the motion did not establish such a circumstance, because the emergency occurred several days after the due date for the Second Amended Complaint. [23]. The Court has held the Motion for Extension in abeyance, but ordered Plaintiff to file her proposed Second Amended Complaint within the ten-day period requested, which Plaintiff did on March 6, 2017 [25]. Noting that it possessed the discretion to excuse a late filing of the Second Amended Complaint even if it was technically out-of-time, the Court further ordered briefing on whether it would be futile to exercise such discretion on the basis that the proposed Second Amended Complaint, even if permitted, would be subject to dismissal for failure to state a claim. *See* Order [30]. The parties have since set forth their respective briefs on this question [31][32].

## II.    THE ALLEGATIONS

### A.    *The Complaint [3] and Amended Complaint [16]*

Plaintiff alleges that she is a 53 year-old African American female who has been disabled since April 2006. Am. Compl. [16] at 5. She served as a flight attendant with an airline subsequently acquired by Defendant (Northwest) until approximately 2006, when she suffered a workplace accident in which she inhaled toxic chemicals. *Id.* at 7. This left her with a permanent condition known as Occupational Induced

Asthma: Reactive Airways Dysfunction Syndrome (RADS), which impedes her ability to breathe freely and has resulted in her disability. *Id*.

Plaintiff, who apparently had remained on medical leave for several years, indicates that she requested and was denied reasonable accommodations in 2008, and again in November 2012. *See* Complaint [3] at 8, 16. In or around June 2013, Plaintiff requested that she be permitted to retire, which according to Plaintiff, Defendant initially agreed to. *Id*. at 9. However, at some subsequent point, she was informed that she was not eligible for retirement benefits because of her age. *Id*. at 9-10, 16. Plaintiff questioned this, but never received documentation as to Defendant's retirement policies. *Id*. Plaintiff alleges that she would have been eligible for lifetime travel benefits under Northwest's pre-merger policy, because she had already completed 10 years of service. *Id.*; Am. Compl. [16] at 7-8. But Plaintiff does not appear to allege any facts to suggest that this historical Northwest policy still applies.

In the meantime, Plaintiff was periodically asked to sign a settlement agreement as to her pending workers' compensation issues. *Id*. at 8; Am. Compl. [16] at 8; [16-7]. Such draft agreements included proposed general releases for all other claims Plaintiffs might have against Defendant, including under Title VII and the ADA. *Id*. Plaintiff refused to sign the releases. *Id*. Plaintiff characterizes this refusal as protected activity under either Title VII or the ADA, because her refusal to sign these settlement

5

agreements constituted her "opposition to participating in what she in good faith believes was a practice that [sic] unlawful under the employment discrimination statutes by refusing to sign an unlawful Settlement Agreement and Release that require her to waive Federal protection and rights including EEOC and ADA." Am. Compl. [16] at 10.

Plaintiff left the company apparently voluntarily, believing that she had retired, on or about July 30, 2013. *See id.* at 6. On July 30, 2013, she was told that she did not in fact meet the age requirements for retiree pass travel but the correspondence that Plaintiff received from human resources continued to describe Plaintiff as being in "retirement." *See* [16-5]. In August 2013, Plaintiff filed a complaint with the EEOC alleging discrimination on the basis of disability and retaliation. Am. Compl. [16] at 11. As late as October 31, 2013, Defendant was offering settlement agreements for Plaintiff to sign that included releases of claims, which Plaintiff refused to sign. *See id.* at 10-11.

In January 2014, Plaintiff discovered that her separation from the company was actually coded as being on grounds of "resignation" and not "retirement." Am. Compl. [16] at 11. Plaintiff alleges that her status must have been changed at some point from "retirement" to "resignation" prior to January 2014. *See id.* at 10-11.

The Amended Complaint alleges six counts: (1) Retaliation: Wrongful Termination– ADA, in which Plaintiff alleges that she was retaliated against under the ADA by having her status changed from "retirement" to "resignation" as a result of her refusal to sign settlement agreements that would release potential claims in June or July 2013 and on October 31, 2013, and/or for her EEOC complaint in August 2013, and/or for having requested accommodations; (2) Retaliatory Harassment Discrimination- ADA, in which Plaintiff alleges that her rights to retiree pass privileges and other benefits of retirement were extinguished because, at some point after January 2013, she was placed on "unapproved medical leave." Plaintiff alleges that this action was in "violation of ADA retaliation harassment"; (3) "Retaliation Discrimination," in which Plaintiff complains about the lack of accurate information from Defendant and other alleged acts of harassment; (4) "Interference," in which Plaintiff complains that Defendant offered her settlement agreements in exchange for inadequate consideration that would, if executed, involve her release of claims under Title VII and otherwise; (5) "Disability Harassment," which is again premised on Defendant's offer of settlement agreements; and (6) "ERISA Interference," in which Plaintiff complains about Defendant changing her status to Unapproved Medical Leave Absence, which allegedly had the impact of denying her retiree benefits.

Plaintiff's complaints attach a variety of emails, documents, and at least one of her right to sue letters. *See, e.g.,* Compl. [3] at 15; Am. Compl. [16-1] at 1.

B.    *Defendant's Motion to Dismiss [9]*

Defendant filed its Motion to Dismiss on December 22, 2016. Among other arguments, Defendant argues that Plaintiff's claims for discrimination and retaliation are untimely, as they were filed more than 90 days after receipt of her right to sue letter, which was dated on June 23, 2016. Defendant thus attaches Plaintiff's two EEOC charges and right to sue letters. *See* Motion [9]; attachments [11-1] [11-2]. The Court finds that these documents are permissible to consider on the record of these motions, as the EEOC charges are central to the allegations and have been referenced directly in the various pleadings. *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the court may consider the documents part of the pleadings for the purposes of Rule 12(b)(6) dismissal."); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *see also Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("[A] document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, we may

consider such a document provided it meets the centrality requirement imposed in *Horsley*.").

C.     *Proposed Second Amended Complaint*

In response to the Court's Order requiring Plaintiff to file a consolidated amended complaint that includes the existing claims in the instant action and any additional claims she wishes to assert from the 3765 action, but no new, additional claims or theories without leave of the Court, Plaintiff on March 6, 2017 filed a 76-page long proposed pleading that includes 16 purported claims. *See* [25].[3]

Nevertheless, the proposed Second Amended Complaint appears to remain focused on the same basic issues as the prior pleadings, specifically as to the

---

[3] On its face, this new proposed pleading goes beyond the scope of the two complaints that the Court instructed Plaintiff to simply consolidate. The original complaints in the 3717 and 3765 cases were on the order of 20 pages each, much of which was duplicative. The instant case (3717) includes six claims, mainly for overlapping and duplicative restatements of the same theories of retaliation. The original 3765 complaint included some of the same issues, but also arguably added complaints about discrimination on the basis of race, age and gender. *See* 1:16-CV-3765 [Doc. 3] at 6. The undersigned's belief in ordering Plaintiff to file a single consolidated complaint was that the result would be a more streamlined document absent the duplication. Instead, the result was nearly twice the page length and included roughly twice the number of claims as the original two complaints that were supposed to be consolidated.

circumstances that led to the change in Plaintiff's "retirement" status to "resignation." Among the additional detail includes[4]:

Defendant was informed on November 11, 2011, by Plaintiff's physician, Dr. Orme, that Plaintiff was not able to return to flying status. *See* Proposed Sec. Am. Compl. [25] ¶ 22. Nevertheless, on January 9, 2012, Defendant sent her a letter demanding that she return to full flying status or face termination. *Id*. Around the same time, Plaintiff and Defendant participated in a mediation regarding her workers' compensation claims, in which Defendant offered her a settlement agreement that would require her resignation and release of all claims. Plaintiff refused. *Id.* ¶ 29. Defendant "did not offer Plaintiff an option of beginning the initial reasonable accommodation interactive dialogue." *Id.* In fact, Plaintiff "requested Defendant to consider her for reasonable accommodation consideration," but Defendant denied the request. *Id. ¶* 31. Plaintiff was also denied the choice to retire at that time. *Id.* ¶ 32.

Plaintiff transmitted further correspondence from Dr. Orme and requested that he be permitted to participate in an interactive reasonable accommodation process. *Id.* ¶ 40. Plaintiff did participate in an interactive conference on May 18, 2012, but without her doctor present. *Id.* ¶ 45. Plaintiff was subjected to a second conference on

---

[4] Because the proposed Second Amended Complaint is 76 pages long, much of which is duplicative or not material, the Court does not include every or even most allegations, but rather has endeavored to include enough material allegations to provide a summary of the issues presented.

June 18, 2012, within just a few days of her learning that Dr. Orme had died. *Id.* ¶ 49. Plaintiff was overwhelmed and not able to effectively represent herself in these proceedings. *Id.* ¶¶ 49-53. Plaintiff did ask about other potential jobs, including non-flying special assignment flight attendant positions, but she was denied. *Id.* ¶ 54. Defendant did not offer any specific position but instructed Plaintiff to view positions online and to compete for any position she desired. *Id.* ¶ 56. Plaintiff, however, was not "psychologically equipped to handle the situation," although she "eventually" checked for open positions. *Id.* ¶¶ 60-61. However, she felt she could not make a decision without input from her doctor, and she still had not obtained another doctor after Dr. Orme's death. *Id.* ¶¶ 60-61. Defendant agreed to let her have more time to obtain a doctor. *Id.* ¶ 62. Finally, Plaintiff picked a new doctor on August 24, 2012, but her treatment with that doctor was delayed for several months due to coverage issues raised by her health insurer (not Defendant). *Id.* ¶¶ 65-70.

During this period of delay, Defendant threatened to end the interactive accommodations discussion, and at some point (in a communication as to which Plaintiff does not include a specific date) stated "if we do not hear from you by October 12, 2012, you will no longer be on an approved leave of absence and your employment may be ended." *Id.* ¶ 78. Plaintiff sent a note from her new doctor after this deadline, in November. *Id.* ¶ 79. But there is no mention of further

communications with Defendant at that point, except for a letter that Plaintiff sent to Delta's CEO asking for his intervention (which he ignored). *Id*. ¶¶ 83, 94.

Ultimately, Plaintiff requested and she claims that Defendant agreed to simply allow her to retire on July 30, 2013. *Id.* ¶ 84. However, Plaintiff indicates that she remained continuously in a dispute with Defendant as to their position that she had not served sufficient time for benefits such as free flying privileges. *Id.* ¶¶ 85-87. Plaintiff thus asserted an EEOC complaint to complain about the denial of retirement benefits in August 2013. *Id.* ¶ 102.

At some point prior to October 18, 2013, Plaintiff's status was "changed" from retirement to resignation. *Id.* ¶ 90. After someone in human resources first told her that she could retire, Defendant then told her at some point that she did not in fact have any eligibility for retirement benefits. *Id.* ¶ 91. Plaintiff has been denied requests for the written policy documents so that she could determine her eligibility for benefits. *Id.* ¶¶ 92-93. Subsequently, on October 31, 2013, Plaintiff was again presented with, and again rejected, settlement agreement drafts that would have called upon her to release all potential claims. *Id.* ¶ 99. In January 2014 Plaintiff learned that her status had been coded incorrectly as "resignation" instead of "retirement." *Id.* ¶¶ 103-104.

The proposed Second Amended Complaint thus alleges (1) Retaliatory discharge/termination, in which Plaintiff appears to argue that the change from

"retirement" to "resignation" was retaliation for a series of acts, including her requests for accommodations, her repeated refusals to agree to settlements and releases, and her August 2013 EEOC complaint; (2) Intentional Infliction of Emotional Distress, based on how Plaintiff was treated during the interactive negotiating process and after her separation of employment, including when she learned that she was not classified as retired; (3) "Retaliatory Harassment Discrimination"; (4) "Retaliatory Harassment Hostile Work Environment"; (5) "Constructive Discharge/ Retaliation Discrimination"; (6) Failure to Accommodate; (7) Failure to Initiate an Informal Interactive Process; (8) "Interference" under the ADA (which appears to be yet another way of re-asserting her retaliation claim); (9) "Interference" – EEOC Title VII; (10) "Failure to Engage in Good-Faith Inactive [sic] Process"; (11) Failure to Engage in Good-Faith and Fair Dealings, including breach of contract; (12) Disability Discrimination (ADA); (13) "Discrimination" for Engaging in Protected Activity under Title VII; (14) Violation of the Rehabilitation Act; (15) "Disparte [sic] Treatment ADA"; and (16) ERISA Interference.

## III.    DISCUSSION

### A.    *The Viability of the Proposed Second Amended Complaint*

#### 1.    The Second Amended Complaint was Untimely Filed

The Court ordered Plaintiff to amend her complaint on January 25, 2017 [20], to consolidate and include the claims from the largely-duplicative 3765 case, and also to provide a more complete and understandable statement of the factual and legal basis for Plaintiff's claims. The Court ordered Plaintiff to do so "**WITHIN TWENTY-ONE (21) DAYS OF THIS ORDER**." Order [20] at 2 (emphasis in original). The 21-day deadline expired as of the close of business on Wednesday, February 15, 2017. Plaintiff filed no amended complaint or request for extension by that deadline.

Instead, one week later, on February 22, 2017, Plaintiff filed her "Emergency Motion for Extension," requesting an additional ten days extension from that date [21]. The grounds for extension were that Plaintiff's mother had a medical emergency requiring hospitalization on Sunday February 19, 2017, which according to the Plaintiff prevented her from filing the Second Amended Complaint by the deadline, which she asserted she believed was Tuesday, February 21, 2017.[5]

In coming to this belief as to her deadline of Tuesday, February 21, Plaintiff assumed that she was entitled to add to the 21-day deadline in the Court's Order the

---

[5] The Court was closed on Monday, February 20, in observance of Presidents' Day.

additional three business days under FED.R.CIV.P. 6(d). This rule adds three business days in situations when a litigant is required to act within a certain number of days *after certain specific types of service*. *Id.* Plaintiff's interpretation of how Rule 6(d) applies in this instance was mistaken, however. The deadline in the Court's January 25 Order was not expressed as a certain number of days *after service* of the Order. It was expressed, rather, as a certain number of days after the date of the Order itself, that is, January 25. Thus, there was no basis to add three days to the 21-day deadline, and Plaintiff's Second Amended Complaint was thereby due on February 15, 2017. Thus, the medical emergency on February 19, 2017 was not itself good cause for missing the deadline, because the deadline expired several days prior to the medical emergency.

Under FED.R.CIV.P. 60(b), the Court must relieve parties from the consequences of a scheduling order on grounds of excusable neglect or mistake. But this does not include a mistake of law even by a *pro se* litigant. *See, e.g., Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, 449 F. App'x 908, 910 (11th Cir. 2011) (noting that "the filings of a *pro se* party are held 'to less stringent standards than formal pleadings drafted by lawyers,' but that "a *pro se* litigant is not exempt" from the Federal Rules of Civil Procedure); *Advanced Estimating Sys., Inc. v. Riney*, 130 F.3d 996, 998 (11th Cir. 1997) (holding that an "attorney's misunderstanding of the plain language of a

[court] rule cannot constitute excusable neglect such that a party is relieved of the consequences of failing to comply with a statutory deadline"); *Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1356 (11th Cir. 2009) (distinguishing mistake of law, which does not constitute excusable neglect, from mistake of fact, which may). Said another way, a *pro se* litigant is generally held to the same deadlines and procedural rules, and her misunderstanding or lack of knowledge of those rules does not entitle her to relief. *See Johnson v. Warden*, 491 F. App'x 60, 62 (11th Cir. 2012). Thus, the proposed pleading was not filed in accordance with the Court's order and would be subject to rejection on that basis alone.

2. Permitting Plaintiff to File Her Second Amended Complaint Out-of-Time Would be Futile, Because It Does Not State a Claim

While Plaintiff's Motion for Extension and her proposed Second Amended Complaint were untimely and not justified by good or excusable cause, the Court retains wide discretion with regard to the application of its scheduling orders. The Court retains the inherent discretion to consider relief in the proper circumstances even absent facts rising to the level of good cause, particularly where the delay was slight and did not result in prejudice. For the reasons explained below, however, it would be futile to consider such action here, because the proposed Second Amended Complaint would not withstand a motion to dismiss as a matter of law.

a.      Standards Under Rule 12(b)(6)

When evaluating a motion to dismiss under Rule 12(b)(6), the Court cannot consider matters outside of the pleadings, and must accept the allegations of the non-movant's pleadings as true, but "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Moreover, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).

*Iqbal* went on to instruct that, while a court must accept all factual allegations in a complaint as true, it need not accept as true legal conclusions recited in a complaint. Repeating that "only a complaint that states a plausible claim for relief survives a motion to dismiss," the Supreme Court advised that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the

pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2))

(other citations omitted).

Although the Supreme Court requires a plaintiff to allege sufficient facts to state

a plausible claim for relief, because Plaintiff is proceeding *pro se* in this case, the

complaint must be "liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

(quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "[A] *pro se* complaint, however

inartfully pleaded, must be held to less stringent standards than formal pleadings

drafted by lawyers." *Id.*; *see also* FED. R. CIV. P. 8(e) ("Pleadings must be construed

so as to do justice."). Even though a *pro se* complaint is held to less stringent

standards than formal pleadings drafted by attorneys, the Court "need not accept as

true legal conclusions or unwarranted factual inferences." *Montgomery v. Huntington

Bank*, 346 F.3d 693, 698 (6th Cir. 2006). Nothing in the leniency accorded a *pro se*

filing excuses a plaintiff from compliance with threshold requirements of the Federal

Rules of Civil Procedure. *See Trawinski v. United Technologies*, 313 F.3d 1295, 1297

(11th Cir. 2002).[6]

---

[6] Defendant argues that the proposed Second Amended Complaint would be
subject to dismissal as a "shotgun" complaint. A shotgun pleading is defined by "the
failure to identify claims with sufficient clarity to enable the defendant to frame a
responsive pleading." *Beckwith v. Bellsouth Telecomms., Inc.*, 146 F. App'x. 368, 371
(11th Cir. 2005) (unpublished). Shotgun pleadings typically "contain several counts,
each one incorporating by reference the allegations of its predecessors, leading to a
situation where most of the counts . . . contain irrelevant factual allegations and legal
conclusions." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellog Corp.*, 305

b. ADA Discrimination/Failure to Accommodate

To the extent the proposed Second Amended Complaint intends to bring claims

relating to Defendant's refusal to offer Plaintiff continued employment pursuant to a

---

F.3d 1293, 1295 (11th Cir. 2002). As a result, "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief" when a plaintiff presents a shotgun pleading. *Anderson v. District Bd. of Trs. of Central Fla. Community Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). The Eleventh Circuit has "roundly, repeatedly, and consistently condemn[ed]" shotgun pleadings, because such pleadings "wreak havoc on the judicial system." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 979 (11th Cir. 2008); *Byrne v. Nezhat*, 261 F.3d 1075, 1130 (11th Cir. 2001).

Plaintiff's proposed pleading, which is 76 pages long and includes sixteen highly overlapping claims, has many of the attributes of a shotgun complaint. Indeed, Plaintiff appears to restate or repackage her basic theory of retaliation for protected activity under the ADA and/or Title VII at least seven different ways, including for "Retaliatory Discharge/Termination" (Count One); "Retaliatory Harassment Discrimination" (Count Three); "Retaliatory Harassment Hostile Work Environment" (Count Four); "Constructive Discharge/ Retaliation Discrimination" (Count Five); "Interference" under the ADA (Count Eight); "Interference" – EEOC Title VII (Count Nine); and "Discrimination" for Engaging in Protected Activity under Title VII (Count Thirteen). She also appears to restate at least six different ways her claim for discrimination under the ADA, which is based on Defendant's alleged failure to maintain Plaintiff's employment pursuant to a reasonable accommodation: Failure to Accommodate (Count Six); Failure to Initiate an Informal Interactive Process (Count Seven); "Failure to Engage in Good-Faith In[ter]active [sic] Process" (Count 10); Disability Discrimination (ADA) (Count Twelve); Violation of the Rehabilitation Act (Count Fourteen); and "Disparte [sic] Treatment ADA" (Count Fifteen). Nevertheless, while the scattershot nature of this pleading creates a burden on the Court and Defendant, the Court believes that it is able to discern the basic set of factual circumstances that underpin Plaintiff's legal claims. Thus, the Court will discuss those allegations and claims below and not recommend dismissal specifically on the basis of this pleading being a "shotgun" complaint.

failure to accommodate her disability– or to the extent the previous Complaints could be read as including such claims– such claims would be meritless.

In sum, the proposed Second Amended Complaint alleges that the Defendant was informed on November 11, 2011, by Plaintiff's physician, Dr. Orme, that Plaintiff was not able to return to flying status. *See* Proposed Sec. Am. Compl. [25] ¶ 22. Nevertheless, on January 9, 2012, Defendant sent her a letter demanding that she return to full flying status or face termination. *Id*. Plaintiff attended interactive discussion meetings with Defendant in May and June, although she did not have her physician present. Plaintiff's specific request for an accommodation–a "non-flying" flight attendant position–was rejected during this time frame, although Defendant offered to allow her to search and apply for other available positions, which she did not do.

First, from these alleged facts, any claims premised on Defendants' failure to offer reasonable accommodations are untimely because the operative facts occurred more than 180 days before her first EEOC charge on August 20, 2013. *See E.E.O.C. v. Summer Classics, Inc.*, 471 F. App'x 868, 869-870 (11th Cir. 2012) ("Failure to file the charge within 180 days of the alleged unlawful employment practice bars the claim."). According to the pleading, Plaintiff made her only specific request for accommodations in meetings in May and June and 2012, which were rejected. The

Complaint identifies no other facts giving rise to alleged violations during the 180 days prior to August 20, 2013, and therefore the claim for failure to accommodate is untimely.

Second, the claim is not supported by the facts alleged. To establish a *prima facie* case of disability-based discrimination under the ADA, a plaintiff must demonstrate that she: (1) has a disability as defined in the ADA, (2) is a "qualified individual," meaning that, with or without reasonable accommodations, she can perform the essential functions of the job she holds; and (3) was discriminated against because of her disability, including by failing to offer her a reasonable accommodation. *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing *Holly*, 492 F.3d at 1256); *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir.1998).

Notably, "an employer is not required to give an employee the best accommodation or the accommodation requested by the employee, so long as the accommodation made is reasonable." *Zimmerman v. Gen. Motors, Delphi Energy & Engine Mgmt. Sys.*, 959 F. Supp. 1393, 1398 (D. Kan. 1997); *see also Griffin v. United Parcel Serv.*, 661 F.3d 216, 224 (5th Cir. 2011) (ADA provides a right to a reasonable accommodation, not a right to the employee's preferred accommodation);

*Zamudio v. Patla*, 956 F. Supp. 803, 809 (N.D. Ill. 1997) ("An employee is not entitled to a particular reasonable accommodation."). It is the Plaintiff's initial burden to demonstrate the existence of a reasonable accommodation under which she would have been able to perform the essential duties of her job. *See Willis v. Conopco, Inc.* 108 F.3d 282, 284-285 (11th Cir. 1997).

Plaintiff does not allege facts to justify an ADA discrimination claim. Most specifically, Plaintiff does not allege facts to suggest that she is a qualified person, that is, that she can actually still perform the essential duties of her flight attendant job, despite her undisputed inability to fly, with or without an accommodation.[7] An employer is not required to create a new position for Plaintiff, to excuse her from performing certain essential functions, or to reallocate essential functions to other employees. The essential functions are by definition those that the individual who

---

[7] While Plaintiff alleges little detail about her disabling condition and its resulting work-related limitations, the Court finds that she has alleged a disability at least to the expansive standards required by the ADA Amendments Act of 2008. *See* 42 U.S.C. § 12102(2)(B) ("a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."); 29 C.F.R. § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard."). Here, Plaintiff alleges that she suffers from a particular condition caused by the inhalation of toxic fumes, which impedes her respiration, and has resulted in a restriction prohibiting her from flying. These allegations are sufficient to establish the existence of a disability.

holds the job would have to perform, with or without accommodation, in order to be considered for the position. *See* 29 C.F.R. 1630.2(n); *Holbrook*, 112 F.3d at 1527; *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (an employer is not required to reallocate job duties in order to change the essential functions of a job); *Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1583 (N.D. Ga. 1994) (a reasonable accommodation does not require an employer to eliminate the essential functions of a position). Thus, if the employee is unable to perform the essential functions of the position with reasonable accommodations, the employer has no duty to eliminate the essential functions of the position or to hire someone else who can perform those functions for the employee.

Here, Plaintiff alleges no facts to suggest that there was even such thing as a non-flying flight attendant special assignment position, much less what the specific duties of that job were vis-a-vis the essential duties of her existing position. Crucially, Plaintiff does not allege facts to show that she could (with her alleged disability) perform the non-flying flight attendant job, or that in doing so she would be performing all of the essential duties of her previous job. Finally, and relatedly, Plaintiff does not allege facts to even show a *prima facie* case that a reasonable accommodation existed that could allow her to perform the essential duties of her job.

Much of Plaintiff's Complaint appears focused on Defendant's alleged lack of assistance in its interactive accommodations process, including that Defendant excluded her physician from the meetings. "When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Louiseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 n. 4 (5th Cir. 1999). Plaintiff, however, does not allege facts suggesting that Defendant was unwilling or otherwise failed to engage in a good faith interactive process. Here, Plaintiff alleges that (a) she participated in multiple meetings with Defendant on the subject of accommodations, although she was denied having her physician physically present for those meetings; (b) she requested and was allowed the opportunity to postpone the process while looking for a new physician, although after several months of delay (caused by insurance problems not attributed to Defendant) the Defendant began sending letters demanding a response; (c) she was denied the particular job she requested, although was offered the chance to apply for other vacancies and did not do so; and (d) she generally felt overwhelmed and unable to prosecute the accommodations process.

In other words, Defendant met multiple times with Plaintiff, offered her opportunities to apply for available vacancies, and gave her extensions in the process while Plaintiff looked for a new doctor. To be sure, Defendant did not agree to the

particular accommodation that Plaintiff requested, *i.e.*, as a non-flying special events flight attendant. But Plaintiff alleges no facts to suggest that such a position exists or that she is qualified for it. In any event, that Defendant did not simply agree to the one request Plaintiff made is not itself evidence of bad faith. Further, Plaintiff does not cite any authority, and the Court is aware of no authority, entitling her to have her physician physically present for these meetings. Finally, Plaintiff cites no facts to suggest that any delay was attributable to lack of good faith by Defendant. To the contrary, the alleged facts state that the delay resulted from the death of Plaintiff's physician and from her inability to prosecute the accommodations process. Even viewing these facts in the light most favorable to Plaintiff, there is simply no basis to find that Defendant failed to engage in good faith in the required discussions.

Thus, Plaintiff does not adequately allege any claim under the ADA for discrimination and/or failure to accommodate and/or failure to engage in the interactive process. Any such claim would be futile to permit to proceed as part of the proposed Second Amended Complaint.[8]

---

[8] In addition to potential claims for discrimination and/or retaliation under the ADA, the proposed Second Amended Complaint now also appears to include a contemplated claim under the Rehabilitation Act. However, that statute does not provide for liability by private parties, the conduct of which is governed by the ADA. *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997); *see also Boone v. Rumsfeld*, 172 F. App'x 268, 270 (11th Cir. 2006). Thus, any separate claim under the Rehabilitation Act would fail and/or be futile.

c.     Retaliation

Most of the overlapping claims in Plaintiff's various pleadings, including the proposed Second Amended Complaint, assert variations of the basic theory that Defendant retaliated against her for various sorts of alleged protected activity under Title VII and the ADA, by changing the code describing her status from "retirement" to "resignation."

(1)     Timeliness

Defendant argues at the threshold that Plaintiff's retaliation claims, and any other claims related to the coding change from retirement to resignation, are time-barred because they were the subject of the EEOC right-to-sue letter dated June 23, 2016 [11-2], which was transmitted more than 90 days prior to the filing of this lawsuit. Specifically, a plaintiff must file a civil action within 90 days of receiving the right-to-sue notice from the EEOC. *See Norris v. Florida Dep't of Health and Rehab. Serv.*, 730 F.2d 682, 682 (11th Cir. 1984); *Law v. Hercules, Inc.*, 713 F.2d 691, 692 (11th Cir. 1983). "It is the equally well established authority of this circuit that federal complaints filed even one day after the expiration of this 90 day period are untimely and, accordingly, subject to dismissal pursuant to a motion for summary judgment." *Brown v. Consolidated Freightway*, 152 F.R.D. 656, 658 (N.D. Ga. 1993).

This deadline runs only upon the Plaintiff's *receipt*, not the transmission, of the right-to-sue notice, although the courts apply a rebuttable presumption of three days for receipt by mail. *See Kerr v. McDonald's Corp.*, 427 F.3d 947, 953 n. 9 (11th Cir. 2005). In this case, the notice was mailed on June 23, 2016, leading to a presumption that Plaintiff received it on June 26. Plaintiff, however, submitted a sworn statement that she received the notice "on or about July 6, [2016]," although she "really cannot remember the exact date." She also states that "the letter was in my box after the 4th of July holiday." [3-1]. Precision matters in this case, however, because the 90th day prior to the filing date of the Complaint was July 6, 2016. Thus, had Plaintiff received the notice on July 5 or earlier, her claims of retaliation would be time-barred.[9]

The Court cannot find that Plaintiff's guesswork and admitted lack of knowledge as to when she received the notice is sufficient, in light of her burden to rebut the evidentiary presumption of prompt receipt. Her statement that she received

---

[9] Defendant suggests that the claims are time-barred even assuming a receipt date of July 6, 2016, because Defendant uses October 6 as the filing date of this Complaint for purposes of its timeliness calculations, not October 5. Here, Plaintiff submitted her Complaint along with an application for leave to proceed *in forma pauperis* on October 5. That application was granted and the Complaint was formally docketed as of October 6. Nevertheless, in these circumstances, where Plaintiff submitted her Complaint with an IFP application on October 5, that is the date that applies for purposes of determining timeliness. Thus, were Plaintiff able to meet her burden of proof to rebut the presumption and show that she received the EEOC right-to-sue letter as late as July 6, the Complaint would be timely. But she does not meet this burden.

the document on "or about" July 6, but does not remember what specific day it was, and can only really say that the letter was in the box after July 4, which time period necessarily also included July 5, simply is not evidence that she received the document on July 6 or later as is necessary to find in this case. *See, e.g., Whitehurst v. Liquid Env't Solutions, Inc.*, 45 F.Supp.3d 1328, 1341 (M.D. Fla. 2014) (Plaintiff's statement that he "guessed" he received the right-to-sue notice "a few days after February 14th" was not sufficient to rebut presumption of receipt after three days of issuance); *see also Curry v. HSBC Tech. & Servs., LLC*, No. 6:11–cv–963–Orl–36GJK, 2013 WL 2039091, at *2–3 (M.D. Fla. May 15, 2013) (finding that the plaintiff failed to meet her burden of satisfying the 90 day filing requirement where the plaintiff was unable to recall the exact date on which she received her right-to-sue letter). Thus, Plaintiff has not rebutted the presumption that more than 90 days passed since receipt of the June 23, 2016 right-to-sue letter, which bars Plaintiff's claims of retaliation.

(2)     Failure to State a Claim

Moreover, Plaintiff's retaliation claims as set forth in the proposed Second Amended Complaint and her prior pleadings fail on the merits.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter

or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The Eleventh Circuit has held that, because this provision creates a prohibition on retaliation under the ADA that is similar to the prohibition on retaliation found in Title VII, courts should evaluate ADA retaliation claims under the same framework used for Title VII retaliation claims. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *see also McNely v. Ocala Star–Banner Corp.*, 99 F.3d 1068, 1075–77 (11th Cir. 1996) (relying on Title VII jurisprudence to interpret meaning of ADA provisions in a retaliation case).

Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee or applicant] has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Proof of retaliation is also governed by the framework of shifting evidentiary burdens established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of*

*Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver*, 922 F.2d at 1525-1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601.

To establish a *prima facie* case of illegal retaliation under Title VII, a plaintiff must generally show that: (1) she engaged in a protected activity or expression; (2) she received an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver*, 922 F.2d at 1524; *Simmons*, 757 F.2d at 1189.

Plaintiff appears to allege that she engaged in protected activity by (a) filing a complaint of discrimination with the EEOC on August 20, 2013, relating to the failure to furnish her with a reasonable accommodation; and (b) refusing to sign draft settlement agreements proposing to resolve Plaintiff's pending workers' compensation claims on various unspecified dates, but as late as October 31, 2013, which draft agreements would have involved a release of potential Title VII and ADA claims. It is less clear as to whether Plaintiff also alleges that her protected activity included her request for reasonable accommodations, but the Court assumes that Plaintiff relies on this theory as well.

Each of these theories faces obstacles. The common problem with all of these theories of retaliation is Plaintiff's failure to allege facts to show that the mere change from "retirement" to "resignation" was an adverse employment action. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.") (emphasis in original). Even interpreting the allegations in the light most favorable to Plaintiff, the mere internal coding change from "retirement" to "resignation," neither of which terms imply anything pejorative about the reasons for Plaintiff's departure, simply does not rise to being an "adverse" action. Notably,

Plaintiff fails to allege facts to show that she was entitled to, but as a result of the coding change was denied, specific material retirement benefits.

To the contrary, Plaintiff alleges that she was told that she did not have sufficient years of active service for retirement benefits. *See* Proposed Sec. Am. Compl. [25] ¶ 91. Far from alleging facts to show a plausible claim for relief, Plaintiff states that she does not have the documentation to determine her eligibility for any particular post-employment benefits under Delta's policies. *Id.* ¶¶ 92-93.[10] It follows that Plaintiff cannot show that the mere change in her status from "retirement" to "resignation" itself had any adverse result.

Moreover, Plaintiff does not allege facts allowing any inference of causation, that is, that her purported protected activity caused Defendant to change her status from "retirement" to "resignation." In terms of Plaintiff's request for accommodations, she alleges that she initially made that request in meetings in May and June 2012, *see* Proposed Sec. Am. Compl. [25] ¶¶ 45-49, and she further states in her EEOC charge that she made that request back in November 2012, *see* [11-1] at

---

[10] The most Plaintiff states as to concrete benefits is that she believes that she would have been eligible under Northwest's pre-merger policies for lifetime travel benefits as an employee with at least ten years of service. Plaintiff does not allege facts to suggest that she would have been so eligible under Delta's policies in 2013 and/or how her possible eligibility for these or other benefits may have been affected by coding her departure status as "resignation" rather than "retirement."

2. Thus, her requests predated the alleged coding change by at least 8-14 months.[11] Without any other facts to suggest causation, no jury could find causation given this substantial lapse in time. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close.") (internal quotes omitted); *see Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (three-month period does not rise to the level of "very close" to support an inference of a causal link); *Higdon*, 393 F.3d at 1221 (three-month period does not allow a reasonable inference of causation); *see also Conner v. Schnuck Markets, Inc.*, 123 F.3d 1390, 1395 (10th Cir. 1997) (lapse of four months between protected activity and termination did not support inference of casual connection); *Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997) (passage of six months between plaintiff's complaint and firing insufficient, without more, to establish causation); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month gap between filing discrimination complaint and receipt of disciplinary letter did not give rise to inference of causal relation).

─────────────────

[11] The Court uses such a wide, vague, range, because Plaintiff simply alleges that her status was changed from "retirement" to "resignation" at some unknown point between her separation from the company as of July 2013 and when she learned about the coding change in January 2014.

With regard to Plaintiff's EEOC charge in August 20, 2013, both the Complaint and the EEOC charge allege that Defendant was already denying her retirement benefits before that date. [11-1] at 3. According to the EEOC charge, "[t]he reason given for denying my retirement benefits was that I am not old enough." *Id.* Notably, Plaintiff did not supply the EEOC with any alleged facts to suggest that she was, in fact, eligible for benefits. But, regardless, there can be no inference of causation on these facts. Where Plaintiff had already been denied benefits prior to her EEOC charge (and where that denial of benefits was in fact a very basis of that charge) it necessarily follows that the filing of the EEOC charge did not cause the denial of benefits.

As to the settlement agreement issue, the proposed Second Amended Complaint suggests that Plaintiff was "continuously" asked to sign various settlement agreements relating to her workers' compensation claims in the years since her original injuries in 2005. *See* Proposed Sec. Am. Compl. [25] ¶¶ 17-18. For example, Plaintiff was "again" offered a settlement during a January 2012 mediation of the workers' compensation claims on terms that would have required release of all other claims, which she refused. *Id*. ¶ 29. As explained above, there can be no inference of causation from these alleged protected acts that occurred many months and years prior to the alleged coding change.

Plaintiff appears to specifically point to one specific denial of settlement on October 31, 2013, on which date "Plaintiff was again presented settlement agreement to resign, waive all legal rights, and inadequate consideration. She again questions the document and refuses to sign." Proposed Sec. Am. Compl. [25] ¶ 99. This date was roughly halfway through the six-month period between when Plaintiff was initially told she could retire and when she later discovered that her status had been changed to "resignation." This event does not establish a *prima facie* case of causation for several reasons. First, no facts alleged in the various complaints or proposed complaint suggest that Plaintiff suffered a denial of retirement benefits in any temporal or other proximity to Plaintiff's rejection of the settlement agreement on October 31. At most, what is alleged is that Plaintiff rejected this deal during a period that may have been as long as three months after, or even as much as three months before, someone changed an internal computer code describing the reason for Plaintiff's departure. Such ambiguities would not support an inference that Plaintiff has a plausible claim.

Second, if anything, the alleged facts show that any denial of her retirement benefits was unrelated to her October 31 settlement response. As noted above, Plaintiff alleged as of her August 20, 2013 EEOC charge that Defendant had *already* denied her retirement benefits by that point, which was more than two months before

she rejected the October 31 settlement offer. Third, even more basically, while Plaintiff may have rejected this particular offer on October 31, she does not allege that this offer and her response differed from those relating to the other offers she "continuously" denied over years including during the mediation in January 2012. Proposed Sec. Am. Compl. ¶¶ 29, 125. There is no basis in the factual allegations of the various pleadings to infer that Defendant would suddenly retaliate in this manner against this particular refusal to sign a settlement agreement after "continuous" refusals dating back nearly a decade.[12]

Thus, Plaintiff fails in any of her various complaints or proposed complaint to allege facts that would plausibly support a *prima facie* case of retaliation and it would therefore be futile to allow further amendment of those claims by way of the proposed Second Amended Complaint.

### d. Harassment/Interference

Plaintiff also includes several overlapping counts appearing to assert that Defendant engaged in illegal harassment over the years in violation of the ADA, principally by (a) subjecting her to an interactive accommodations discussion without

_____

[12] Moreover, courts have generally found that an employee's mere refusal to sign a release of claims is not itself protected activity, because the refusal to sign a release does not necessarily and specifically communicate an opposition to illegal discrimination. *See Roe v. McKee Mgmt. Assocs., Inc.*, No. 16-5520, 2017 WL 690538, *5 (E.D. Pa. February 21, 2017).

her physician or other support, and (b) on several occasions presenting her with potential draft agreements to settle her workers' compensation claims that included general releases of other potential claims.

In order to establish a *prima facie* case for a claim against an employer for a hostile work environment based on harassment, a plaintiff must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there is a basis for holding the employer liable for the harassment either directly or indirectly. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582–83 (11th Cir.2000), *overruled on other grounds*, (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)); *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Henson v. City of Dundee*, 682 F.2d 897, 903-905 (11th Cir. 1982); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

To demonstrate the fourth element of a *prima facie* case of a hostile work environment, a plaintiff must show that her work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working

environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A court must consider the "totality of the circumstances" in determining whether a hostile environment is severe or pervasive enough to be actionable; it must consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris*, 510 U.S. at 23; *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989). Other factors that are relevant are whether the offensive conduct is physically intimidating or humiliating, and whether it unreasonably interferes with the plaintiff's work performance. *Harris*, 510 U.S. at 23.

As the Supreme Court has stated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). In evaluating whether a reasonable person would find conduct to be sufficiently severe or pervasive, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*) ("courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or

conditions of the plaintiff's employment and create a hostile or abusive working environment.").

The facts Plaintiff alleges simply do not rise to the level of illegal harassment. As explained above, Plaintiff has not established that Defendant failed to engage in a good faith interactive accommodations discussion. Indeed, Plaintiff alleges that Defendant met with Plaintiff on multiple times, permitted her to look into and apply for available vacancies (which she did not do), and permitted her reasonable extensions in light of the death of her physician, Dr. Orme. That Defendant did not provide the one accommodation Plaintiff requested, or allow Dr. Orme to be physically present in meetings, or provide an even greater extension, is not "harassment." Nor does Plaintiff establish how simply presenting her with settlement offers is "harassment."[13] Generally, employers can offer to settle on whatever terms they wish, and employees may choose to take those offers or not. The mere extension of an offer–even one deemed to be inadequate–is not itself harassing, much less

---

[13] Moreover, any discrete acts outside of the 180-day period prior to the filing of Plaintiff's first EEOC claim in August 20, 2013 could not be the basis of any suit. As noted above, Plaintiff alleges no specific facts relative to the interactive process during this 180-day period.

conduct that could be deemed sufficiently "severe" or "pervasive" so as to be the basis of a legal claim.[14]

      e.      ERISA Interference

Plaintiff also purports to bring an interference claim under the Employment Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), premised on the circumstances in which her status was re-coded as "resignation" instead of "retirement," and/or on the circumstances governing how her period of leave was treated in the years after her injury.

"An ERISA interference claim requires a showing that the plaintiff '(1) is entitled to ERISA protection, (2) was qualified for the position, and (3) was discharged [or otherwise denied benefits] under circumstances which give rise to an inference of discrimination.'" *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993)). "This section prohibits interference with present pension benefits and also

--------

[14] For much the same reasons, Plaintiff fails to show the sort of extreme and outrageous misconduct that is required to support a state law claim for intentional infliction of emotional distress. *See, e.g., Smith v. Akstein*, 408 F. Supp. 2d 1309, 1336 (N.D. Ga. 2005) (examining the Georgia Court of Appeals' understanding of the standard of outrageousness required in an employment context to establish the conduct is "extreme and outrageous" and noting that "approximately ten threats against [the plaintiff's] future employment and retirement benefits, as well as his life . . . did not rise to a sufficient level of outrageousness"). Thus, the reference in the proposed Second Amended Complaint to such a claim is meritless.

protects against interference with future entitlement to receive the same." *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 558 (11th Cir. 1997).

Plaintiff's claims in this regard fail for several basic reasons. First, with regard to any complaint with regard to how Plaintiff's post-injury leave was accounted for[15], such a claim fails because, as discussed above, Plaintiff fails to allege facts to suggest that she was qualified for the position she held during any of this time. More basically, she fails to allege facts to suggest why she was entitled to have her leave categorized in any particular manner, *i.e.*, as "disability" leave. Indeed, the crux of Plaintiff's complaint appears to be that she was moved from "disability" leave to "non-disability" leave at some point in 2012. But she fails to allege facts to demonstrate that this classification was improper, or inaccurate, or contrary to her rights. Indeed, the facts alleged in the various pleadings suggest only that, by 2012, Plaintiff had been unable to perform her job for over five years, she remained under permanent restrictions including preventing her from flying altogether, and she has not alleged facts to suggest that any accommodation existed that would allow her to otherwise

---

[15] As the Court interprets the allegations, Plaintiff suggests that if her leave had been categorized in a different manner, she may have continued to accrue time towards her eligibility for benefits. Specifically, Plaintiff was under a contractual Disability Medical Leave of Absence that began at the time of her injury and ended in 2012. *See* Proposed Sec. Am. Compl. [25] ¶ 14. Plaintiff alleges that this status was changed at some point in 2012, to "non-disability leave," and she conclusorily asserts that she would have been eligible to retire under her original disability leave status.

perform the essential duties of her flight attendant job. There are no facts alleged to allow the inference that Defendant acted wrongfully or discriminatorily in failing to continue to treat this as "disability" related leave.

Plaintiff also fails to allege if and how any of Defendant's actions actually affected her eligibility for any particular benefits. To the contrary, Plaintiff expressly states that she does not have the documents that state what Delta's retirement policy actually is and what benefits were available in what circumstances. *See, e.g.,* Proposed Sec. Am. Compl. [25] ¶ 92. There remains no factual basis to support a plausible claim of ERISA interference.

* * * *

For all of the reasons explained above, Plaintiff's proposed Second Amended Complaint fails to state a claim and would be due for dismissal on those and other grounds even if allowed to be filed out-of-time. The Court thus finds that it would be futile to exercise any discretion it possesses to allow the late filing, and thereby recommends denial of the Emergency Motion for Extension [21] and rejection of the proposed amendment.

B.    *Dismissal of This Action*

Technically, the operative complaint is the Amended Complaint dated January 17, 2017 [16]. Defendant's pending Motion to Dismiss [9] was addressed to the

original Complaint [3]. Although all of the same arguments continue to apply, the Motion to Dismiss was technically mooted by the filing of the Amended Complaint. Defendant has not filed a second motion to dismiss, because shortly after Plaintiff filed her January 17 Amended Complaint, the Court ordered her to file a Second Amended Complaint. *See* Order [20]. The Court further instructed Defendant to respond as appropriate to the filing of such Second Amended Complaint. However, Plaintiff failed to file a Second Amended Complaint in compliance with the Court's orders as explained above, which means there has never been a new Complaint for Defendant to move to dismiss. Rather, Defendant has, in effect, presented its arguments as to why Plaintiff's claims fail and should be dismissed in the form of its brief opposing leave to amend as futile. *See* Brief Opposing Plaintiff's Second Amended Complaint [31].

Thus, in this odd procedural chronology, there is technically no motion to dismiss pending as to the operative complaint, that is, the Amended Complaint dated January 17, 2017 [16]. The Court nevertheless recommends that this pleading and the case as a whole be dismissed, on several grounds. First, the Court ordered Plaintiff to re-plead that Complaint, in part to allow for manageable adjudication of the claims, and to require Plaintiff to provide a factual basis for her claims under the standards of *Iqbal* and *Twombly*. Plaintiff failed to comply with that Order, as explained above.

This failure to obey a lawful order of the Court is itself grounds to dismiss the case under Local Rule 41.3A(2), NDGa.

Second, the claims in the January 17, 2017 complaint fail for all of the same reasons as have been discussed *ad nauseam* above. Title 28, U.S.C., § 1915(e)(2)(B) states that the Court "shall dismiss [an IFP] case at any time," on its own motion, if it determines that the action fails to state a claim on which relief may be granted or otherwise is frivolous. Nothing is presented in the Amended Complaint that is substantially different from and more viable than the allegations in the original Complaint [3] and proposed Second Amended Complaint [25]. Indeed, the proposed Second Amended Complaint constitutes Plaintiff's effort to incorporate and more thoroughly explain the charges that she was already bringing in this action, as well as to also incorporate additional claims from the 3765 action. Plaintiff has had the opportunity to argue the sufficiency of these allegations and has filed a brief arguing that her proposed Second Amended Complaint should be permitted. These arguments are meritless, and it necessarily follows that the same allegations in the Amended Complaint [16] should be dismissed for the same reasons.[16]

---

[16]As this is a mere recommendation, not a final order of dismissal, Plaintiff will have the further opportunity to argue the sufficiency of her allegations in the form of objections to the instant Report and Recommendation.

## IV.    RECOMMENDATION

The undersigned **RECOMMENDS** that the Motion to Dismiss [9] be **DENIED AS MOOT**. The undersigned also **RECOMMENDS** that the Emergency Motion for Extension [21] and Motion in Opposition [17] be **DENIED** and that the proposed Second Amended Complaint [25] not be permitted to proceed, both as untimely and as futile.

It is **FURTHER RECOMMENDED** that this case be **DISMISSED WITH PREJUDICE** for the reasons stated above.

**IT IS SO RECOMMENDED** this 31st day of May, 2017.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE